**Scarlett McDaniel BARTS,**
**Plaintiff–Appellee,**

v.

**Mike JOYNER and Nelson Blount, individually and in their official capacities as Deputy Sheriffs of Jefferson County, Florida, Defendants–Appellants.**

Nos. 87–3773, 87–3868.

United States Court of Appeals,
Eleventh Circuit.

Jan. 27, 1989.

Rehearing and Rehearing In Banc
Denied March 1, 1989.

Julius F. Parker, Parker, Skelding, McVoy & Labasky, Tallahassee, Fla., for defendants-appellants.

Edward S. Stafman, Tallahassee, Fla., for plaintiff-appellee.

Before KRAVITCH and EDMONDSON, Circuit Judges, and HOFFMAN *, Senior District Judge.

EDMONDSON, Circuit Judge:

Because the record demonstrates no violation of a clearly established constitutional right, we reverse, in part, the judgment of the district court in this action based on 42 U.S.C. sec. 1983; and because the damages were not correctly limited, we vacate the remainder of the judgment and remand for a new trial on damages.

### Background

Plaintiff Scarlett Barts lived with Billy and Virginia Floyd. Though not related to

---

* Honorable Walter E. Hoffman, Senior U.S. District Judge for the Eastern District of Virginia, sitting by designation.

them, Barts referred to the Floyds as her parents. Billy Floyd and Barts were alone in the Floyd home one afternoon when he was shot and killed. Barts drove to a nearby highway patrol station and reported that her "father" had been shot by an unknown intruder, a black man. Barts then went to the hospital where Billy Floyd had been taken. Floyd's wife, daughter and two family friends were also at the hospital. Deputy Mike Joyner, wearing his deputy sheriff's uniform, spoke with Floyd's wife and daughter, who had apparently found Billy Floyd prostrate on the front lawn of the Floyd home shortly after the shooting. He then read Barts the *Miranda* warnings and questioned her regarding the shooting. Barts told Joyner the same story of an intruder entering the Floyd home and shooting her "father."

Later, while still at the hospital, Joyner again spoke to Barts and asked her if she owned a gun. Barts answered that she did and that she kept it in the glove compartment of her car. Barts agreed to let Joyner look at it. Joyner obtained the keys to the car and looked in the car for the gun, but the gun was not there. Barts told him that someone must have stolen it. Joyner called his superior, Captain Blount, who was investigating the scene of the shooting. Joyner repeated Barts' story and told Blount that "something didn't sound right." Blount told Joyner, "Y'all get back as quick as possible." Joyner took this statement to mean that Blount wanted Barts, apparently the only eyewitness to the shooting, and the other family members to go with Joyner for more questioning at the sheriff's station in the Jefferson County jail. Barts, Floyd's wife, Floyd's daughter and a family friend accompanied Joyner to the station.

Barts then was again read her *Miranda* rights, and Joyner and Blount questioned her for about three hours. Barts finally told Joyner that Floyd had come in while she was in the bathroom and started kissing her all over. She said that when she struggled with him he left. Barts admitted that she had shot Floyd when he came at her again. Defendants arrested Barts for the murder of Billy Floyd.

Barts was tried and convicted of second degree murder. Her attorney stated that she was unable to give him any details of the killing because she always became too upset. Barts served eight months of a twenty-five year sentence before her release on appellate bond. She finally was able to tell a psychologist and then her attorneys that she shot Floyd because he had raped her and she thought he was attempting to do so again. Barts was granted a new trial because of her inability to communicate with her attorneys due to Rape Trauma Syndrome and because of her corresponding incompetence to stand trial. Barts was acquitted at her second trial.

Barts brought an action under 42 U.S.C. sec. 1983 against Joyner and Blount individually and in their capacities as deputy sheriffs of Jefferson County, Florida alleging that Barts' detention and transportation to the sheriff's station was an unlawful seizure within the meaning of the fourth amendment. A jury awarded Barts damages of $175,000 from each defendant.

*Qualified Immunity*

■ Appellants contend that they are entitled to qualified immunity because their conduct in March 1983 did not violate clearly established law. To the extent that defendants were sued in their individual capacities, we agree.

We begin our analysis of the qualified immunity defense with *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed. 2d 396 (1982). The *Harlow* Court held that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* at 818, 102 S.Ct. at 2738, 73 L.Ed.2d at 818. In so holding, the Court established an objective standard to make summary judgment and similar judicial decisions appropriate devices to "avoid excessive disruption of government and permit the resolution of many insubstantial claims...." *Id.; see also Mitchell v. Forsyth,* 472 U.S. 511, 528, 105 S.Ct. 2806,

2816, 86 L.Ed.2d 411, 426 (1985) (issue of qualified immunity is question of law for courts to decide).

The *Harlow* decision sets up a bright-line test that is a powerful constraint on causes of action under section 1983. To defeat a qualified immunity defense, plaintiff bears the burden of showing that "the legal norms allegedly violated by the defendant were clearly established at the time of the challenged actions or, .. the law clearly proscribed the actions the defendant ... took." *Mitchell*, 472 U.S. at 528, 105 S.Ct. at 2816, 86 L.Ed.2d at 426. Plaintiff cannot discharge her burden simply by making general, conclusory allegations of some constitutional violation or by stating broad legal truisms. Rather, as the courts have plainly stated, plaintiffs must prove the existence of a clear, factually-defined, well-recognized right of which a reasonable police officer should have known. *See Clark v. Evans*, 840 F.2d 876, 880, 881 (11th Cir. 1988). "The words 'clearly established ... constitutional rights' may not be used to read the defense of immunity out of federal tort law by the facile expedient of stating constitutional rights in the most general possible terms.... *The right must be sufficiently particularized to put potential defendants on notice that their conduct probably is unlawful.*" *Azeez v. Fairman*, 795 F.2d 1296, 1301 (7th Cir. 1986) (emphasis added). "[O]ur cases establish that the right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant, sense: *The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.*" *Anderson v. Creighton*, 483 U.S. 635, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987) (emphasis added). "[T]he qualified immunity defense ... provides ample protection to all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271, 278 (1986).

"General propositions have little to do with the concept of qualified immunity." *Muhammad v. Wainwright*, 839 F.2d 1422, 1424 (11th Cir.1987). The question in this case is not whether it is clearly established that unreasonable seizures are prohibited; they are. Nor is the question whether probable cause is necessary for a lawful warrantless arrest; it is. Nor is the question whether an involuntary trip to the police station can violate the fourth amendment; it can. The question in this case is far more sharply focused: in March 1983, was it clearly established in this circuit that it was an unconstitutional seizure for a single police officer—shortly after a murder—to have a person in a public place accompany him (along with other family members who were potential witnesses) to police headquarters for further questions, where the person had initiated contact with law enforcement officials by going to a police station to report the murder, had claimed to have seen the shooting and the assailant who was still at large, had remained in the officer's presence while willingly assisting with the investigation, and never objected to traveling to headquarters? The answer is "No."

Appellee relies chiefly on *Dunaway v. New York*, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979), as the case that makes clear that Joyner and Blount's conduct violated Barts' fourth amendment rights. In *Dunaway*, three police officers—acting on an informant's lead implicating Dunaway in a robbery/murder that had occurred five months earlier—picked up Dunaway at a neighbor's house, drove him to police headquarters and questioned him. Dunaway gave the police incriminating statements, and he was arrested. The Supreme Court determined that the police violated the fourth amendment when, without probable cause to arrest, they took Dunaway into custody, transported him to the police station, and detained him there for interrogation. *Id.* at 216, 99 S.Ct. at 2258, 60 L.Ed. 2d at 838. The Court decided that Dunaway was "seized" when he was taken involuntarily to the police station. *Id.* at 207, 99 S.Ct. 2253, 60 L.Ed.2d at 832. In the circumstances of that case, the Court further observed that Dunaway's detention was almost indistinguishable from an arrest because he was not questioned briefly where

he was found, was taken from a neighbor's home to a police station interrogation room, was never informed that he was free to go and would have been physically restrained if he had refused to accompany the officers. *Id.* at 212, 99 S.Ct. at 2256, 60 L.Ed. 2d at 836.

While *Dunaway,* a direct criminal appeal, is pertinent to this civil case, it is too different in its facts to have settled the law applicable to the facts of this case. These differences are especially important when one recalls that *Dunaway* was decided by a court consisting of only eight Justices, that two Justices dissented, and that two concurred specially, one of whom stressed that in particular cases extraordinary private or public interests might require a different result and that "flexibility" was essential. *Id.* at 220, 99 S.Ct. at 2260, 60 L.Ed.2d at 841 (White, J., concurring). While *Dunaway* is law, it was by no means clear that *Dunaway* would or should be extended to other cases with different facts. Because of important distinctions in the circumstances surrounding the questioning of Barts, a reasonable person in March 1983 would not have known that Joyner and Blount's conduct violated clearly established law.[1]

In contrast to *Dunaway,* the crime here was not months old, but only hours old; and the police did not go in force to a private home to pick up a suspect. Barts made the first contact with police when she drove to the highway patrol station to report the shooting. She then drove to the hospital where she cooperated fully in police questioning about the incident and allowed police to check her car for her gun. When Joyner told Barts, the only known eyewitness, and the others that they were "going to have to ride back to Monticello" with him, Barts never objected or indicated any unwillingness to accompany Joyner and, just as she had since she first contact-

ed the police, gave every indication that she was willingly cooperating with the police in the investigation. Barts never was touched or handcuffed, and she rode in the police car with other family members who were also potential witnesses. This case is too unlike *Dunaway* for *Dunaway* to have settled the applicable law; even if we assume that a seizure took place, it was not clearly established that the seizure was impermissible under the circumstances of this case.

Appellee also cites *United States v. Berry,* 670 F.2d 583 (5th Cir. Unit B 1982) (en banc) (affirming cocaine possession conviction). *Berry* is an airport stop case and what was said there must be read in that unique context. *Cf. United States v. Gollwitzer,* 697 F.2d 1357, 1360 (11th Cir.1983) (*Berry* not controlling on maritime stops and seizures). In addition, in *Berry,* the DEA agents had no certain knowledge that a crime had occurred or that Berry knew anything about a crime. Here, Joyner and Blount had certain knowledge that a homicide had very recently occurred and that Barts knew a lot about it. *Berry* is too different to have "clearly established" the law applicable in this circuit to the facts of this case; nor have we found any other case that does so.

Not only were *Dunaway* and *Berry* too different on their facts to have settled the law, but other judicial opinions have determined that conduct similar to that of Blount and Joyner was reasonable in the fourth amendment sense. *See Daniel v. Taylor,* 808 F.2d 1401 (11th Cir.1986) (law enforcement officers who detained plaintiff for two hours and forty-five minutes without probable cause while searching for evidence pursuant to search warrant entitled to qualified immunity because they did not violate clearly established constitutional right); *State v. Chaffee,* 285 S.C. 21, 328 S.E.2d 464 (1984) (five hour detention of

---

1. Nor was the law applicable to the circumstances of this case settled by the earlier case of *Davis v. Mississippi,* 394 U.S. 721, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969) (direct criminal appeal), which has also been advanced by plaintiff. *Davis* involved a police dragnet taking, without probable cause for arrest, dozens of black

youths to police headquarters, over a period of about ten days, for fingerprinting and questioning following a rape committed by a single person. Davis himself was taken into custody multiple times without probable cause. *Dunaway* is more like our case than *Davis;* thus, we have addressed *Dunaway* at greater length.

two suspects reasonable in light of all the circumstances including nature of crime and fact that suspicion, even if short of probable cause, was great); *Buckingham v. State*, 482 A.2d 327 (Del.1984) (that police returned suspect, without probable cause to arrest, to robbed grocery store for identification was lawful, limited intrusion reasonably justified under circumstances); *Wilkerson v. United States*, 427 A.2d 923 (D.C.App.1981) (value of on-the-scene identification while victim's memory is fresh justified transportation of appellant short distance to rape scene despite lack of probable cause); *People v. Herron*, 89 Ill.App. 3d 1048, 45 Ill.Dec. 641, 412 N.E.2d 1365 (1980) (finding *Dunaway* inapplicable despite lack of probable cause to transport defendant and noting even if defendant had been taken involuntarily to crime scene, the purpose was to ensure defendant's availability as a witness to offender's identity); *Harris v. United States*, 382 A.2d 1016 (D.C.App.1978) (where facts gradually escalate toward probable cause, reasonable extension of duration of stop to await outcome of further police investigation is justified).

In *People v. Lippert*, 89 Ill.2d 171, 59 Ill.Dec. 819, 432 N.E.2d 605 (1982), a police officer stopped Lippert on suspicion of armed robbery. The officer detained Lippert and transported him to an inn where he was identified by the robbery victim. While the court determined that probable cause to arrest existed when Lippert was placed in the police car, the court held alternatively that Lippert's detention and transportation would have been a legitimate investigative procedure even in the absence of probable cause. *Id.* 59 Ill.Dec. at 823–24, 432 N.E.2d at 609–10. The court explained that the line between a legitimate seizure of a suspect on less than probable cause in a *Terry* stop,[2] and the impermissible seizure in *Dunaway* is "not completely clear." *Id.* 59 Ill.Dec. at 824, 432 N.E.2d at 610. The Illinois Supreme Court saw a middle ground wherein an investigatory detention can be employed by officers acting on less than probable cause to arrest. *Id.* at 824, 432 N.E.2d at 610.

One way the Illinois court distinguished the case before it from cases like *Dunaway* was that, unlike *Dunaway*, where the seizure occurred long after the crime, the officer in *Lippert* was conducting a field investigation within a few minutes of the crime. The Illinois court further proclaimed that "the apparently hard rule of *Dunaway* had been softened somewhat" by *Michigan v. Summers*, 452 U.S. 692, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981), a case where the Court found it reasonable for police to detain defendant on less than probable cause while they searched a house for narcotics pursuant to a search warrant. 59 Ill.Dec. at 825, 432 N.E.2d at 611. The *Lippert* court stressed the Supreme Court's statement that "the exception for limited intrusions that may be justified by special law enforcement interests is not confined to the momentary on-the-street detention accompanied by a frisk for weapons...." *Id.* (quoting *Summers*, 452 U.S. at 699–700, 101 S.Ct. at 2592–93, 69 L.Ed. 2d at 348.)

Another case that demonstrates that the law regarding detention and transportation to a police station was not clearly established is *People v. Vena*, 122 Ill.App.3d 154, 77 Ill.Dec. 582, 460 N.E.2d 886 (1984), where the police stopped three men to check their identity because of complaints regarding suspicious persons in a residential area. The police said that, although defendant and the two other men were not violating the law when police first saw them, police were aware of two burglaries in the area during the previous week. When the three men ran, the police apprehended them, conducted a fruitless patdown search, handcuffed Vena and transported all three to the police station to await investigation of the area where the three men were found. The police admitted that when the defendants were taken to the station, the police had no cause to believe that a crime had just been committed

---

**2.** Under *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), an officer may stop and "frisk" for weapons even though no probable cause exists if he reasonably believes suspect is armed and dangerous.

or that defendants had committed any crime. After defendants were taken to the station, the police developed information linking Vena to burglaries near the neighborhood where he was apprehended. The court did not view "the removal of defendants to the police station as more intrusive *per se* than detaining them in the open field or in the squad car." *Id.* 77 Ill.Dec. at 589, 460 N.E.2d at 893. "Under these exceptional circumstances, we do not feel there was an unreasonable intrusion sufficient to trigger the proscriptions of *Dunaway.*" *Id.* at 590, 460 N.E.2d at 894 (citation omitted).

These opinions, allowing detention in the absence of probable cause to arrest, seem reasoned and reasonable. We do not rely on them, however, to hold that the seizure of Scarlett Barts complied with the Constitution; we do not address that question. We merely recognize that the law in March 1983 was ambiguous on when the detention of the only suspect/eyewitness to a recent homicide became impermissible. Defendants are entitled to immunity, unless plaintiff demonstrates that it was in March 1983 a settled question of law that the detention and transportation of Barts to the station was unconstitutionally unreasonable in the exceptional circumstances of this case. Because other courts have upheld the detention of suspects for up to five hours, the transportation of suspects and witnesses for identification purposes, and the transportation of people to a police station based on vague knowledge of crimes committed a week earlier, we cannot say the law was settled that on the facts of this case— where the only eyewitness to an extremely recent homicide (with the killer supposedly still at large) initiates contact with the police and remains in contact throughout the investigation, giving every appearance of concern and willingness to help—transporting Barts to the station for further investigation into the crime was an unconstitutional seizure.

In Barts' second criminal trial, she moved to suppress her statements to the police on the ground that the statements were fruits of an illegal arrest [3] and seizure in violation of the fourth and fourteenth amendments. The motion was denied. The state judge addressed *Dunaway* expressly but concluded *Dunaway* and its progeny did not condemn the actions of the police officers in this case where the officers were faced by a homicide that had just occurred at the residence of Barts and the victim and where a killer described by Barts was still at large. The Florida court said that public safety demanded an aggressive effort to make an apprehension or to make substantial progress in ascertaining what had happened. The Florida court also noted that the events preceding Barts' interrogation were "initiated and largely the result of defendant [Barts] voluntarily proceeding to the Florida Highway Patrol Station" and reporting a burglary and shooting. *Cf. Kansas v. Long,* 679 P.2d 1185 (Kan.1984) (court determined, despite conflicting testimony, that defendant accompanied police voluntarily but noted that defendant who initially contacted police about missing person set in motion factfinding process by police to locate that person, including the permissible transportation of defendant to police station for questioning after body of missing person was found).

That a state trial judge rejected the claim of unconstitutional police conduct and denied the motion to suppress does not control our decision here. *See generally Malley v. Briggs,* 475 U.S. 335, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986). But on the issue of whether the pertinent law was clearly established, the opinion and decision of the state court do count. We cannot realistically expect that reasonable police officers know more than reasonable judges about the law. Even if the state trial judge in Barts' criminal case was mistaken in denying the motion to suppress, if that judge's opinion about the fourth amendment's application to the events was within the range of professional competence (that is, was not an unacceptable error indicating

---

**3.** In their brief, defendants concede that they had no probable cause to arrest Barts until after

she confessed. We accept this concession without reviewing it.

"gross incompetence or neglect of duty"), the police officer defendants ought not be held liable. *See Malley,* 475 U.S. at 346 n. 9, 106 S.Ct. at 1099 n. 9, 89 L.Ed.2d at 281 n. 9. To say the least, when a state court judge upholds the constitutionality of police actions, that alerts us to be particularly careful in concluding that the law was truly clearly established before we permit the officers to be held civilly liable.

In *Anderson v. Creighton,* the Supreme Court said that the relevant question is whether a reasonable officer could have believed a warrantless search to be lawful "in light of clearly established law and the information the officer possessed." 107 S.Ct. at 3040. We think that the case law and the undisputed facts of this case prove that a reasonable officer with the information Joyner possessed could have believed that as a matter of law he could detain Barts awhile. If it is plain that Barts had been seized, it was unclear such seizure was unconstitutional in the light of the circumstances, particularly the freshness of the crime and the need to ensure Barts' availability as the only witness to the offender's identity. *See Herron,* 45 Ill.Dec. at 641, 412 N.E.2d at 1365; *State of Florida v. Barts,* No. 33–83–18–CF–A (Fla. Cir.Ct. Dec. 13, 1985). Put differently, it had not been clearly established before March 1983 that having an unobjecting critical witness go, within hours of a murder, to headquarters with a police officer was an unreasonable seizure in the circumstances of this case.

The line between the lawful and the unlawful is often vague.[4] *Harlow's* "clearly established" standard demands that a bright line be crossed. The line is not to be found in abstractions—to act reasonably, to act with probable cause, and so forth—but in studying how these abstractions have been applied in concrete circumstances. In 1983 the relevant case law was still developing; courts, including the Supreme Court of the United States, talked about flexibility and special law enforcement interests that might apply here. The key issue in this case had not been clearly settled: whether the exigent circumstances surrounding the questioning of the only eyewitness to a fresh homicide where the perpetrator was supposedly still at large were within the "middle ground" between *Terry* and *Dunaway* so that the officers investigating the murder could properly detain Barts awhile. *See Lippert,* 59 Ill.Dec. at 824, 432 N.E.2d at 610. To be sure, *Dunaway* had been decided and would apply where old crimes were being investigated and multiple police officers took a lone suspect—who had in no way initiated the contact with law enforcement officials—from a private home to police headquarters. But this was not such a case. Other cases indicate that *Dunaway* has limits, especially in more exigent situations. *See, e.g., Vena,* 77 Ill.Dec. at 582, 460 N.E. 2d 886. When Scarlett Barts rode to the police station with other family members to assist in finding the assailant of her father, *Dunaway's* limits had not been defined in this circuit. The bright line of "clearly established law" remained to be staked out by a process of inclusion and exclusion in individual cases.

■ Joyner and Blount have not argued on appeal that their conduct in seizing and initially detaining Barts satisfied the fourth amendment, but have instead argued that various defenses bar the action against them even if they violated the Constitution.[5] Because the case comes to us in this

---

4. When we decide constitutional issues in the context of criminal proceedings, unlike in section 1983 cases, we know the case is on one side of the line or the other. We simply decide if it is on the wrong side. How close a policeman's act came to being lawful is frequently unimportant if police conduct crossed the line—however vague a line it might be—into the unlawful zone. In decisions holding a police officer's conduct unconstitutional in criminal cases, judicial conclusions are often stated starkly because the gradations are unimportant. Our section

1983 decisions must recognize—in a way that most other judicial decisions do not—that some cases are very near each other but on opposite sides of the line. As a consequence, constitutional law precedents from other than section 1983 actions are helpful but rarely directly decisive on qualified immunity questions in cases brought under 42 U.S.C. sec. 1983.

5. In addition to a defense of qualified immunity, defendants have argued that the first conviction of Barts precludes, as a matter of law, any

way and because we decide constitutional issues as a last resort, we need not and do not decide whether the Constitution was violated, but accept as a given the district court's judgment finding and concluding that the Constitution was violated.

■ Although we conclude that defendants are entitled to the benefit of qualified immunity under *Harlow*, this does not require that the judgment be totally reversed. The judgment in this case was against defendants in both their official and individual capacities. Appellants have never contended that the judgment is not in conformity with the pleadings, proof, and issues in the district court. *Harlow*'s qualified immunity is no defense to an action brought against someone in his official capacity. *Fitzgerald v. McDaniel*, 833 F.2d 1516, 1520 (11th Cir.1987). The judgment of liability against defendants in their official capacities stands; and we must turn to a consideration of damages.

*Damages*

■ No one disputes that the confession, when linked to the other information[6]

available to the police, was sufficient to justify a lawful arrest. Once the officers were faced with probable cause to arrest, they had a duty to arrest Barts. *See Smith v. Gonzales*, 670 F.2d 522, 527 (5th Cir.1982). Her detention became at that time consistent with the fourth amendment.[7] Therefore, we hold that defendants can be liable only for the damages suffered by Barts during the approximately three hours she spent at police headquarters before she confessed and for any damages directly resulting from that detention.[8]

■ We reject plaintiff's contention that she is entitled to damages for her criminal trials, conviction, incarceration, and the resulting aggravation of her Rape Trauma Syndrome. The intervening acts of the prosecutor, grand jury, judge and jury—assuming that these court officials acted without malice that caused them to abuse their powers—each break the chain of causation unless plaintiff can show that these intervening acts were the result of deception or undue pressure by the defendant policemen.[9] *See Smiddy v. Varney*, 803

---

conclusion that Barts was seized without probable cause to arrest. *See generally Goldstein v. Sabella*, 88 So.2d 910 (Fla.1956). *See also Migra v. Warren City School Bd. of Educ.*, 465 U.S. 75, 104 S.Ct. 892, 79 L.Ed.2d 56 (1984) (state court judgment must be given same preclusive effect in section 1983 suits in federal court as would be given in courts of issuing state). Barts' first conviction was set aside because she was deemed incompetent to stand trial. Even assuming that Florida law controls, Florida must satisfy the requirements of the due process clause. *Kremer v. Chemical Const. Corp.*, 456 U.S. 461, 482, 102 S.Ct. 1883, 1898, 72 L.Ed.2d 262 (1982). Florida "may not grant preclusive effect in its own courts to a constitutionally infirm judgment [ ], and other state and federal courts are not required to afford full faith and credit to such a judgment." *Id.* (*quoted in Gjellum v. City of Birmingham*, 829 F.2d 1056 (11th Cir.1987)). Therefore, whatever conclusive significance Barts' conviction might have had was lost once the conviction was set aside on the ground that Barts was incompetent to stand trial.

6. For example, by the time Barts admitted shooting Billy Floyd, police had discovered that the caliber of Barts' missing gun matched the caliber of the bullets used in the shooting; and Captain Blount had observed that Barts' "black man intruder" story was inconsistent with the

physical evidence at the crime scene. Of course, Barts had already said that she, Billy Floyd and the intruder were the only people there when Billy was shot.

7. Barts does not contend that her case proceeded in an irregular fashion after her confession. She makes no allegation of undue delay in bringing her before a magistrate or any other such improper action. Put simply, nothing suggests that after her confession and before her indictment, Barts' detention became again unlawful.

8. If it appears on retrial that at the sheriff's station the police officers had probable cause to arrest even before Barts confessed, the time of detention that might justify damages should be reduced accordingly.

9. Incidentally, even if we now assume that Barts' confession was the product of an unlawful seizure and ought to have been totally excluded from consideration in her criminal proceedings, we cannot say the use of the confession—even if that use was a mistake—was outside the range of professional competence of court officials: at the pertinent time, the confession was not clearly the result of an unlawful seizure. See discussion of qualified immunity set out earlier in this opinion.

F.2d 1469 (9th Cir.1986); *Duncan v. Nelson,* 466 F.2d 939 (7th Cir.1972); *see also Hand v. Gary,* 838 F.2d 1420 (5th Cir.1988) (in section 1983 action based on false arrest, grand jury or other independent intermediary breaks chain of causation unless defendant policemen mislead intermediary); *Scanlon v. Flynn,* 465 F.Supp. 32 (S.D.N.Y.1978) (stating that under New York law, damages for false arrest are measured only to time of arraignment or indictment because, after such an evaluation, subsequent detention is attributed to independent, supervening determination of probable cause, not to earlier improper arrest); *cf. Jones v. City of Chicago,* 856 F.2d 985 (7th Cir.1988) (decision of prosecutor to charge or grand jury to indict does not shield police officer who deliberately supplied misleading information). Plaintiff introduced no evidence that the intervening acts of the prosecutor, grand jury, judge or jury were caused by any deception or undue pressure by Joyner or Blount.[10]

■ Barts argues that *Malley v. Briggs,* 475 U.S. 335, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986), means that a judge's decision—even in the absence of deception or undue pressure on the judge—will not always break the causal chain that began with police misconduct. This view of *Malley* is correct; but we question whether *Malley's* holding extends beyond its facts. In *Malley,* the court held that a police officer submitting affidavits in application for arrest warrant (or search warrant) may be held liable for damages resulting from arrest (or search) under the authority of the warrant when no reasonable police officer could have believed that the affidavits established probable cause, and that the action of the judge issuing the warrant does not break the causal chain. *Malley* never considered the question of whether, once an arrest has incorrectly occurred, later independent decisions of prosecutors, juries and judges to prosecute, indict, convict, and sentence would break the chain of causation for damages that might relate to the original unlawful seizure. But we believe

that these independent acts must break the causal connection and that Barts' extended detention was caused by these public authorities and not by Joyner and Blount.

In *Malley,* the police initiated the arrest and were the sole source of the information available to the judge approving the warrant. When the police apply for a warrant and a judge approves a warrant, they use the same legal standard; and the police have as much or more information at that time than does the judge. Arresting suspects is police business. The police have it within their power to avoid the damage caused by a false arrest simply by not seeking the warrant. Thus, because the police have control over the damages, it makes sense to hold the police responsible for damages caused directly by the initial arrest when the police acted clearly unlawfully in arresting someone or in seeking a warrant to arrest someone. Such liability punishes and deters conduct over which the police have control.

Once someone is arrested and then substantial evidence of the suspect's guilt comes to light, the police can do little or nothing to stop further proceedings. Holding the police responsible for damage due to these later proceedings makes little sense. Prosecuting, indicting, finding ultimate guilt, and sentencing criminal defendants are not the business of the police. In addition, arresting police officers do not ordinarily control all the information available to the prosecutor, the grand jury, the trial jury and trial judge. The decisions to prosecute, to indict, to convict, and to sentence are independent from and involve considerations different from the original decision to arrest and result in different harm to a person than the harm caused by the original arrest.

Criminal procedure from arrest to sentencing involves a division of power and duties among several entities, each of which has the responsibility to make its own decisions. To hold that the decisions of the prosecutor, juries and judge do not break the chain of proximate causation

---

**10.** At the new trial on damages, plaintiff may introduce evidence on those points if she has

any.

trivializes the importance of these post-arrest decisions, which do not merely pass on the correctness of the seizure or arrest by police but which, based on all the information then available to these court officials, determine the likelihood that a potential defendant is guilty of violating the law. Plaintiff has directed our attention to no precedent either under section 1983 or the common-law tort of false arrest in which a recovery has been allowed against arresting officers for everything, including time served in prison following a conviction, that followed the improper seizure or arrest; we will not create that precedent in the absence of a showing that the police officers deceived the court officials or unduly pressured them or that the court officials themselves acted with malice and the police joined with them.

We REVERSE the judgment against defendants in their individual capacities and VACATE the judgment against defendants in their official capacities and REMAND for a new trial on the question of damages due from defendants in their official capacities.[11]

---

11. In an effort to obtain a new trial on liability, Joyner and Blount have also contended that the trial court erred in excluding the expert testimony of a physician. This contention is without merit.