Rose George, as administratrix of the estate of Andre George, deceased, appeals from a summary judgment entered against her in favor of the defendants, Earnell McIntosh-Wilson, chief executive officer of Partlow State School and Hospital ("the Hospital"); Dr. Louis Tyler, director of health services at the Hospital; and Gilda Felts, L.P.N. The action claimed damages pursuant to 42 U.S.C. § 1983. We affirm in part, reverse in part and remand.
On September 10, 1986, Andre George, a profoundly retarded, paraplegic resident at the Hospital, suffocated on a surgical glove that he ingested while unattended by hospital personnel. The undisputed evidence reveals that Mr. George had a habit of chewing and "mouthing" anything within his reach, including towels, rags, his clothing or the clothing of others. If nothing else was available, he would insert his thumb *Page 1060 
into his mouth "far enough usually to gag himself."
In response to this habit, the hospital formulated procedures for Mr. George's "habilitation." On April 7, 1986, the Hospital instituted a 90-day "behavioral management plan" aimed at mitigating the habit. Additionally, on June 16, 1986, the Hospital formulated an "individual habilitation plan" that sought not only to alleviate the chewing problem, but also to increase his "skills in dining and toileting" and his awareness of himself and his environment, and to promote his "recreation and social skills" through a regimen of exercise and "gross motor activities." At night, the staff routinely pulled his bed away from the wall to prevent Mr. George from chewing on the curtains.
Between 6:30 and 7:00 P.M. on the day of the accident, Mr. George was one of four residents being "toileted" by Barbara Jackson, a mental health worker I, who was assigned to his cottage. Her task was interrupted by the request of another staff member for assistance in preparing a birthday party for some of the residents. She left Mr. George in the restroom, restrained by a lap belt in his wheelchair, a few feet from a sink on which lay some surgical gloves. While unattended, Mr. George ingested a glove and died as a result.
His mother, as administratrix of his estate, sued Jackson, McIntosh-Wilson, Dr. Tyler, and Felts under 42 U.S.C. § 1983
alleging violations of rights guaranteed by the Fifth and Fourteenth Amendments.[1] All the defendants filed motions for summary judgment. On May 11, 1990, the trial court denied the motion of Barbara Jackson and granted the motions of Mrs. McIntosh-Wilson, Dr. Tyler, and Ms. Felts. The summary judgment for these defendants stated:
 "The Court has concluded that the activities in which these defendants were engaged entitle such defendants to the cloak of absolute or constitutional immunity since they were engaged in discretionary public acts as to which there were no hard and fast rules concerning the course of conduct required to be taken or not taken. Because such activities required the defendants to exercise judgment and choice, involving what was just and proper in given circumstances, the Court has found such defendants immune from the claims alleged pursuant to 42 U.S.C. § 1983. See, e.g., Barnes v. Dale, 530 So.2d 770 (Ala. 1988); Smith v. Arnold, [564 So.2d 873 (Ala. 1990)]."
On June 7, 1990, the trial court made the partial summary judgment final pursuant to Ala.R.Civ.P. 54(b). On July 13, 1990, this Court denied Barbara Jackson's petition for permission to appeal from the interlocutory order of May 11; therefore, the claim against her is not before this Court. On appeal, Ms. George contends that the summary judgment, which was based on a finding of immunity, was erroneous. We agree that the judgment was erroneous as to defendant McIntosh-Wilson, but we conclude that it was proper as to Dr. Tyler and Ms. Felts.
In pertinent part, 42 U.S.C. § 1983, provides as follows:
 "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the person injured in an action at law, suit in equity, or other proper proceeding for redress. . . ."
Id. Section 1983 preempts state law and provides a federal cause of action for violations of rights guaranteed under the Constitution of the United States. Monroe v. Pape,365 U.S. 167, 173-75, 81 S.Ct. 473, 476-78, 5 L.Ed.2d 492 (1961), overruled on *Page 1061 
other grounds Monell v. Department of Social Services,436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). State officials acting in their official capacities are not "persons" for purposes of claims for damages under § 1983. Will v. MichiganDep't of State Police, 491 U.S. 58, 109 S.Ct. 2304,105 L.Ed.2d 45 (1989).
In their individual capacities, however, state officials may be liable for damages resulting from discretionary acts[2] that violate "clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v.Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738,73 L.Ed.2d 396 (1982). "Good-faith" or "qualified" immunity is available as an affirmative defense to a wide variety of public officials. Id. at 815, 102 S.Ct. at 2736; Schuck, Suing OurServants: The Court, Congress, and the Liability of PublicOfficials for Damages, 1980 Sup.Ct.Rev. 281, 293-95. In order to defeat a qualified immunity defense, the plaintiff "bears the burden of showing that 'the legal norms allegedly violated by the defendant were clearly established at the time of the challenged actions.' " Barts v. Joyner, 865 F.2d 1187, 1190
(11th Cir.) (quoting Mitchell v. Forsyth, 472 U.S. 511, 528,105 S.Ct. 2806, 2816, 86 L.Ed.2d 411 (1985)), cert. denied, ___ U.S. ___, 110 S.Ct. 101, 107 L.Ed.2d 65 (1989); see alsoFeagley v. Waddill, 868 F.2d 1437, 1439 (5th Cir. 1989); Richv. Dollar, 841 F.2d 1558, 1564 (11th Cir. 1988); Zeigler v.Jackson, 716 F.2d 847, 849 (11th Cir. 1983). Only if a state official exhibits deliberate indifference to his official duties may he be liable for damages under § 1983.
A qualified immunity analysis requires a legal determination both as to the state of the law at the time of the alleged violation and "as to the existence of a genuine issue of fact as to whether the defendant engaged in conduct violative of the rights established by that clearly established law."Rich, 841 F.2d at 1564. The first question thus requires us to consider whether it was clearly established that Mr. George enjoyed a constitutional right to an environment reasonably safe from suffocation on ingestible objects, which his known propensity would have rendered highly likely. We answer that question in the affirmative.
As early as 1972, the United States District Court for the Middle District of Alabama addressed the scope of constitutional guarantees accruing to the residents of Partlow State School and Hospital. Wyatt v. Stickney, 344 F. Supp. 387
(M.D.Ala. 1972), modified sub nom. Wyatt v. Aderholt,503 F.2d 1305 (5th Cir. 1974) (affirming the "district court's orders recognizing the constitutional right to treatment"). Finding conditions at the Hospital to be "grossly substandard," the court noted:
 " 'The evidence has reflected further that safety and sanitary conditions at Partlow are substandard to the point of endangering the health and lives of those residing there, that the wards are grossly understaffed, rendering even simple custodial care impossible, and that overcrowding remains a dangerous problem often leading to serious accidents, some of which have resulted in deaths of residents.' "
Id. at 391. Declaring that the "gravity and immediacy of the situation [could not] be overemphasized," id. at 394, the court stated: "Unfortunately, never, since the founding of Partlow in 1923, has the Legislature adequately provided for that institution. The result of almost fifty years of legislative neglect has been catastrophic; atrocities occur daily." Id. at 393 (footnotes omitted).
In order to rectify constitutionally deficient conditions, which resulted, in part, from the "virtual absence of administrative and managerial organization," id., the court formulated and ordered the implementation of a program entitled "Minimum Constitutional Standards for Adequate Habilitation of the Mentally Retarded." The standards, inter alia, provided: *Page 1062 
"II. Adequate Habilitation of Residents
 "1. Residents shall have a right to habilitation,[3] including medical treatment, education and care, suited to their needs, regardless of age, degree of retardation or handicapping condition.
 "2. Each resident has a right to a habilitation program which will maximize his human abilities and enhance his ability to cope with his environment.
". . . .
"IV. Humane Physical and Psychological Environment
 "15. Residents shall have a right to dignity, privacy and humane care.
". . . .
 "28. The institution shall prohibit mistreatment, neglect or abuse in any form of any resident."
Id. at 396-401. The court, expressly retaining jurisdiction to ensure compliance, further ordered the Hospital administration to submit follow-up reports and financial statements. Id. at 395. These "minimum constitutional standards" outlined by the court fairly implied a constitutional guarantee to a reasonably safe environment and presaged the holding of the United States Supreme Court in Youngberg v. Romeo, 457 U.S. 307, 319,102 S.Ct. 2452, 2459, 73 L.Ed.2d 28 (1982).
In Youngberg, the Court accorded a "liberty interest in safety" under the Fourteenth Amendment to residents of mental health care institutions. This interest imposed upon the state the "unquestioned duty to provide reasonable safety for all residents and personnel within the institution[s]." Id. at 324, 102 S.Ct. at 2462.
Thus, by September 10, 1986, it was clearly established that the Hospital's residents enjoyed constitutionally protected interests in reasonable care and safety. This is especially true in view of the history of litigation directly involving the Hospital and the ongoing supervision exercised by the federal district court. The defendants cannot claim qualified immunity solely on the argument that George's constitutional rights to be reasonably safe from potentially deadly objects were not clearly established at the time of the accident. We, therefore, direct our attention to the question concerning the existence of a genuine issue of fact, which must be viewed in light of the standard of culpability announced inYoungberg, in order to determine whether the defendants violated the constitutional rights of Andre George.
 Earnell McIntosh-Wilson
In deference to the exercise of discretion required of mental health care professionals, Youngberg held that the discretionary acts and decisions of such professionals will provide a ground of liability "only when the decision . . . is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." Id. at 323, 102 S.Ct. at 2462. "Deliberate indifference" thus forms the relevant standard of culpability with regard to whether constitutional rights were violated in this case.
The administrator of a mental health care institution may incur supervisory liability under § 1983 for a constitutional deprivation where the policies of the Hospital as formulated orapplied result in such a lack of training and supervision as to constitute deliberate indifference to clearly established constitutional rights to a reasonably safe environment. Such indifference constitutes a "personal involvement" in the alleged violation. See Williams v. Smith, 781 F.2d 319, 323 (2d Cir. 1986); McKinnon v. Patterson, 568 F.2d 930, 936 (2d Cir. 1977), cert. denied, 434 U.S. 1087, 98 S.Ct. 1282,55 L.Ed.2d 792 (1978); see also City of Canton v. Harris, 489 U.S. 378,109 S.Ct. 1197, 103 L.Ed.2d 412 (1989) (municipal liability depends on "whether there is a direct causal link between a municipal policy or custom, and the alleged constitutional deprivation"). In *Page 1063 
other words, policy-making administrators would be liable for the constitutional deprivations caused by their subordinates if they exhibited such a degree of indifference to compliance with their policies as to demonstrate that they did not base their actual administrative decisions or actions on the professional judgments embodied in the policy. Cf. Youngberg, 457 U.S. at 323, 102 S.Ct. at 2462; City of Canton, 489 U.S. at 390, 109 S.Ct. at 1205 (through indifference, a municipality could "actually have a policy of not taking reasonable steps to train its employees").
As chief executive officer, Mrs. McIntosh-Wilson formulated policies and procedures for the administration of the Hospital, including individual habilitation plans. Her duties included "quality control," that is, responsibility for implementing procedures to ensure compliance with formulated policy. In opposition to the motions for summary judgment, Rose George submitted the affidavit of her expert, who faulted the policies and procedures in the following respects:
 "I see no evidence of on-going communication between the administration, psychiatric staff and direct care staff as related to Andre Alex George; in fact, the mental health worker on duty at the time of the incident testified that she did not know if a Behavioral Management Plan was in effect for Andre Alex George. The records that I have reviewed indicate a long and substantial history of maladaptive behavior on the part of Andre Alex George in regard to the mouthing of his hands and objects. That the administrative defendants failed to insure that this information would be adequately disseminated to the direct care staff is a departure from professional standards that in my opinion are absolutely necessary for the maintenance of a safe environment.
". . . .
 "Assuming that policies existed at the time of the incident to impart information to subordinates and direct care employees regarding the provision and maintenance of a reasonably safe environment for the care of Andre Alex George, I see no evidence that this in fact occurred. The fact that the direct care employee left Andre Alex George alone in the bathroom for an extended period of time relative to his mental condition and needs is a strong indication that the policies or customs of the . . . Hospital regarding patient safety were below the standard of care as implemented and maintained."
(Emphasis added.)
Rose George's expert found evidence of faulty communication at the administrative level. Indeed, the record indicates that Barbara Jackson received only 10 minutes of formal instruction on Andre George's behavior and habilitation plans at the time of her assignment to his care. Moreover, Jackson testified that no one had ever discussed George's mouthing habit with her. The question whether, notwithstanding documentary evidence of administrative cognizance of George's needs, Hospital policies were more illusory than real presents a factual issue that precludes summary judgment. Rose George should have been given further opportunity to prove her allegations regarding this defendant's exercise of judgment and the possible existence of a mere "paper policy."
 Dr. Louis Tyler and Gilda Felts
Concerning defendants Dr. Tyler and Ms. Felts, however, the plaintiff has failed to meet her burden of showing the existence of a genuine issue of fact regarding their alleged breach of the Youngberg standard. The unrebutted evidence as to the roles played by these defendants in the administrative policies and procedures of the Hospital was revealed through depositions offered in support of the motion for summary judgment.
As director of health services, Dr. Tyler supervised only the staff physicians practicing in the areas of "general family medicine." Neither he nor his subordinates were responsible for the implementation or the promulgation of individual habilitation plans. Within the organizational structure of the Hospital, he was not responsible for *Page 1064 
the supervision or training of Barbara Jackson or other mental health workers. Indeed, his only connection with this case appears to be an informational memorandum that he sent to Mrs. McIntosh-Wilson summarizing Mr. George's physical condition preceding the accident and detailing the cause of death.
Likewise, the evidence indicates that Ms. Felts, a licensed practical nurse on duty at the time of the accident, was not responsible for the implementation or the promulgation of individual habilitation plans. She was not responsible for the supervision of the residents or for the supervision or training of mental health workers. Her sole connection to this case appears to be her unsuccessful attempts to resuscitate Andre George upon discovery of the accident by Barbara Jackson. This § 1983 claim turns on allegations of the promulgation of unconstitutional policies or procedures regarding the supervision of residents, rather than on allegations of medical malpractice, and the record reveals no evidence of deliberate indifference on the part of Gilda Felts to the constitutional rights of Andre George.
The summary judgment, therefore, was proper as to Dr. Tyler and Ms. Felts, and as to those defendants the judgment of the trial court is affirmed. However, as to defendant Mrs. McIntosh-Wilson, the judgment is reversed and the cause is remanded for further proceedings.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
HORNSBY, C.J., and ALMON, SHORES, HOUSTON, STEAGALL, KENNEDY and INGRAM, JJ., concur.
[1] Although it is not a model of clarity, count five of the complaint sufficiently alleges a claim that the defendants, in their individual capacities, "promulgated, established, and implemented procedures, customs and practices which were improper policy regarding the supervision of residents located at Partlow."
[2] The cases on which the trial court relied in its order granting the defendants' motion for summary judgment were inapposite as neither case involved an action under § 1983.
[3] "Habilitation" was defined as "the process by which the staff of the institution assists the resident to acquire and maintain those life skills which enable him to cope more effectively with the demands of his own person and of his environment and to raise the level of his physical, mental, and social efficiency." Wyatt, 344 F. Supp. at 395.