1 So.3d 980 (2008)
Ex parte MADISON COUNTY BOARD OF EDUCATION and Jim Nash, personnel director for the Madison County Board of Education.
(In re A.S., a minor, by and through her natural parents and next friends, J.S. and R.S., et al.
v.
William Ford Reaves et al.).
1061715.
Supreme Court of Alabama.
June 27, 2008.
*983 Mark S. Boardman and Clay R. Carr of Boardman, Carr, Hutcheson & Bennett, P.C., Chelsea, for petitioners.
Dennis E. Goldasich, Jr., Justin L. Smith, and Victoria L. Dye of Cross, Poole, Goldasich & Fischer, LLC, Birmingham, for respondent A.S., a minor, by and through her natural parents and next friends, J.S. and R.S.
Karen K. Hall, Madison County Circuit Judge, Huntsville.
On Application for Rehearing
STUART, Justice.
This Court's opinion of March 14, 2008, is withdrawn, and the following is substituted therefor.
The Madison County Board of Education ("the Board") and Jim Nash, the personnel director for the Board, petition this Court for a writ of mandamus directing Judge Karen K. Hall to grant their motions for a summary judgment dismissing the federal 42 U.S.C.  1983 claim against them on the basis of qualified immunity. We grant the petition as to Nash and deny it as to the Board.

Facts
During the fall of 2002, A.S. was an 11-year-old fifth-grade student attending Madison County Elementary School. According to A.S., her physical-education teacher, William Ford Reaves, raped her. She did not tell anyone about the rape, but she asked to be removed from Reaves's physical-education class. Her class schedule was changed, and she had no further contact with Reaves. In January 2003, A.S. transferred to Riverton Middle School. Her parents did not provide Madison County Elementary School officials with any reason for the transfer. However, it appears from the materials submitted to this Court that A.S. wanted to change schools because some of the other students at Madison County Elementary School made fun of her learning and speech disabilities.
In May 2004, A.S. told a couple of girlfriends at Riverton Middle School that Reaves had raped her. The girlfriends encouraged A.S. to tell the counselor at Riverton Middle School. After A.S. informed the school counselor about the rape, the school counselor notified A.S.'s parents and the principal at Riverton Middle School, who notified Nash. Nash immediately placed Reaves on administrative leave and went to Riverton Middle School to investigate. Nash and the principal met with A.S.'s parents; A.S.'s parents refused to allow Nash to interview A.S. As part of his investigation into the allegation, Nash interviewed the principal, the assistant principal, the counselor at Madison County Elementary School, Reaves, a student teacher under Reaves's supervision, and an aide in Reaves's class. The student teacher and the aide stated that they had never seen Reaves act inappropriately. Nash reported his findings to the superintendent. School and/or Board officials arranged for A.S. to receive counseling.
It appears that over a period of 16 years before they became aware of this allegation, school and/or Board officials had investigated various allegations of inappropriate conduct by Reaves on 5 occasions *984 and had placed written reports in Reaves's employee file. Nash was aware of three of the five investigations at the time they were being conducted,[1] and school officials reprimanded Reaves in some form in response to each investigation.
The first investigation occurred in 1986, before Nash became personnel director. The report of that investigation indicated that Reaves had been accused of inappropriately touching a female high-school student on her buttocks and inappropriately commenting that another female high-school student was "looking good." The high-school principal orally reprimanded Reaves and placed a notation about the incident in Reaves's employee file.
The second reported incident occurred in 1990. A female student complained to her high-school principal that Reaves had asked her if she liked sex, had walked into the girls' locker room while female students were changing clothes, had straddled her legs while she performed sit-ups in his physical-education class, had touched her breast through her clothing, and had rubbed her leg. Nash and other school officials investigated the allegation and obtained written statements from the student and three other student witnesses. The student was removed immediately from Reaves's class. When the principal confronted Reaves, Reaves denied the accusations and stated that he would be more careful in his conduct toward students. The principal and the assistant principal increased their supervision of Reaves.
The third reported incident occurred in 1991 when two female high-school students informed the high-school principal that Reaves had touched the legs of one of the female students, had commented that she should not have worn a certain shirt because he could see her black bra, had stated that "he bet there wasn't a girl in the school he couldn't get," and had rubbed a female student's hair, commented on her chest, and patted her on the stomach. The principal and Nash interviewed the two students making the complaint, as well as two other female students. The two students alleging the misconduct by Reaves made written statements about the incidents. The principal and Nash also reinterviewed two of the students who had been involved in the 1990 investigation and were told of additional inappropriate sexual conduct and comments by Reaves. The students' schedules were changed and they had no further contact with Reaves. When confronted with the accusations, Reaves denied the misconduct. School officials, including the superintendent, met with the Board's attorney and determined, with counsel's advice, that there was insufficient evidence to terminate the employment of Reaves, a tenured teacher. Another written reprimand was placed in Reaves's file, and he was transferred to Madison County Elementary School, where he would not have contact with high-school-age females.
In 1996, the fourth report was created when a female student at Madison County Elementary School and her mother reported that Reaves had told the student to "suck my right nut." The principal investigated the incident, and Reaves denied making the statement, stating that he had instead said "suck my nose." The principal, who did not involve Nash in the investigation of the incident, informed Reaves that any additional report would result in a recommendation that Reaves's employment be terminated.
*985 The fifth incident occurred in 2002 when female students in Reaves's physical-education class complained to the school counselor about the way Reaves made them perform push-ups.[2] The school counselor reported the complaints to the principal but refused to give the principal the students' names. The principal investigated and interviewed two adult female teaching assistants in Reaves's class. The assistants informed the principal that the female students had performed the push-ups in the normal and proper way. The principal confronted Reaves and ordered him not to place himself in such a questionable situation in the future.
In 2004, when school officials and Nash learned of A.S.'s accusation that Reaves had raped her in 2002,[3] Nash immediately placed Reaves on administrative leave. Reaves retired before a decision was made as to whether to terminate his employment.
In 2005, A.S. and her parents sued Reaves, the Board, Nash, and others alleging state and federal claims, including a Title IX claim and the following 42 U.S.C.  1983 claim:
"46. The School Board defendants [which include the Board and Nash] deprived plaintiff A.S. of the constitutional right to be free from sexual abuse and molestation under the color of state law and acted with deliberate indifference.
"47. The School Board defendants violated 42 U.S.C.A.  1983 (2000) by allowing an employee, the defendant Reaves, to continue teaching and/or coaching with multiple complaints on his record for sexual harassment while taking no action to punish this pedophile or to stop this pedophile's sexual misconduct. As a proximate result of the said violation, the plaintiff A.S. was sexually molested and raped.
"48. The above named defendants also failed to develop, implement or administer procedures or policies reasonably designed to provide protection for the mentally handicapped plaintiff from sexual molestation while attending a public school.
"49. This violation of 42 U.S.C.A.  1983 (2000) by the above named Defendants, proximately caused injuries and damage to the Plaintiff, A.S...."
The Board and Nash answered, alleging among other defenses State-agency immunity, immunity under the Eleventh Amendment to the United States Constitution, and qualified immunity. In 2007, they moved for a summary judgment, arguing that they were immune from liability. After conducting a hearing, the trial court entered a summary judgment for Nash on all state-law claims, entered a summary judgment for Nash and the Board on the Title IX claim, and denied the Board's and Nash's summary-judgment motion on A.S.'s  1983 claim. The Board and Nash timely filed this petition for a writ of mandamus.

Standard of Review
[1-6]"`"Mandamus is a drastic and extraordinary writ, to be issued only where there is (1) a clear legal right in the petitioner to the order sought; (2) an imperative duty upon the respondent to perform, accompanied by a refusal to do so; (3) the lack of another adequate remedy; and (4) properly invoked jurisdiction of the court." Ex *986 parte Integon Corp., 672 So.2d 497, 499 (Ala.1995) .... Our review is further limited to those facts that were before the trial court. Ex parte American Resources Ins. Co., 663 So.2d 932, 936 (Ala.1995).'
"Ex parte National Sec. Ins. Co., 727 So.2d 788, 789 (Ala.1998)."
Ex parte Alabama Dep't of Youth Servs., 880 So.2d 393, 398 (Ala.2003).
"`While the general rule is that the denial of a motion for summary judgment is not reviewable, the exception is that the denial of a motion grounded on a claim of immunity is reviewable by petition for writ of mandamus. Ex parte Purvis, 689 So.2d 794 (Ala. 1996)....
"`Summary judgment is appropriate only when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Rule 56(c)(3), Ala. R. Civ. P., Young v. La Quinta Inns, Inc., 682 So.2d 402 (Ala. 1996). A court considering a motion for summary judgment will view the record in the light most favorable to the nonmoving party, Hurst v. Alabama Power Co., 675 So.2d 397 (Ala. 1996), Fuqua v. Ingersoll-Rand Co., 591 So.2d 486 (Ala.1991); will accord the nonmoving party all reasonable favorable inferences from the evidence, Fuqua, supra, Aldridge v. Valley Steel Constr., Inc., 603 So.2d 981 (Ala.1992); and will resolve all reasonable doubts against the moving party, Hurst, supra, Ex parte Brislin, 719 So.2d 185 (Ala.1998).
"`An appellate court reviewing a ruling on a motion for summary judgment will, de novo, apply these same standards applicable in the trial court. Fuqua, supra, Brislin, supra. Likewise, the appellate court will consider only that factual material available of record to the trial court for its consideration in deciding the motion. Dynasty Corp. v. Alpha Resins Corp., 577 So.2d 1278 (Ala.1991), Boland v. Fort Rucker Nat'l Bank, 599 So.2d 595 (Ala.1992), Rowe v. Isbell, 599 So.2d 35 (Ala.1992).'
"Ex parte Rizk, 791 So.2d 911, 912-13 (Ala.2000)."
Ex parte Turner, 840 So.2d 132, 135 (Ala. 2002). See also Ex parte Sawyer, 876 So.2d 433 (Ala.2003) (addressing a petition for a writ of mandamus filed by a public official seeking review of the trial court's denial of immunity in a  1983 action).

Discussion
The Board and Nash contend that they have a clear legal right to a summary judgment on A.S.'s  1983 claim.
First, the Board contends that it has a clear legal right to a summary judgment on A.S.'s  1983 claim because, it says, it is immune from suit under  1983.[4] In Monell v. New York City Department of Social Services, 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), the United States Supreme Court held that a cause of action under  1983 can be brought against a local government when its official policies result in a constitutional tort. In Jett v. Dallas Independent School District, 491 U.S. 701, 737, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989), the Supreme Court further held that it is a court's duty to identify governmental bodies "who *987 speak with final policymaking authority for the local governmental actor concerning the action alleged to have caused the particular constitutional or statutory violation at issue." However, it is well established that if a local government body is acting as an "arm of the State," which includes agents or instrumentalities of the State, then Eleventh Amendment immunity bars the suit. Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 280, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), and Regents of the Univ. of California v. Doe, 519 U.S. 425, 429-30, 117 S.Ct. 900, 137 L.Ed.2d 55 (1997). "Whether a defendant is an `arm of the State' must be assessed in light of the particular function in which the defendant was engaged when taking the actions out of which liability is asserted to arise." Manders v. Lee, 338 F.3d 1304, 1308 (11th Cir.2003). See McMillian v. Monroe County, Alabama, 520 U.S. 781, 785-86, 117 S.Ct. 1734, 138 L.Ed.2d 1 (1997); Jett, 491 U.S. at 738, 109 S.Ct. 2702 (question is whether school superintendent "possessed final policymaking authority in the area of employee transfers"). Secondly, the determination is dependent on an analysis of state law. McMillian, 520 U.S. at 786, 117 S.Ct. 1734.
In Manders, the United States Court of Appeals for the Eleventh Circuit acknowledged that although the decision whether an entity is an "arm of the State" for Eleventh Amendment purposes is a question of federal law, "the federal question can be answered only after considering provisions of state law." 338 F.3d at 1309. See also Regents of the Univ. of California, 519 U.S. at 429 n. 5, 117 S.Ct. 900 (stating that the Eleventh Amendment question "can be answered only after considering the provisions of state law that define the agency's character"). To assist in the analysis, the Manders court established the following four-factor test to apply when determining whether an entity is an "arm of the State" in carrying out a particular function:
"(1) [H]ow state law defines the entity; (2) what degree of control the State maintains over the entity; (3) where the entity derives its funds; and (4) who is responsible for judgments against the entity."
338 F.3d at 1309. We apply this four-factor federal law test to the facts of this case to determine whether the Board is an "arm of the State" and thus entitled to Eleventh Amendment immunity.[5]
In the case before us, the Board's function that is at issue here involves the Board's ability to transfer and/or terminate a teacher's employment. It is with regard to this particular function that we will evaluate whether the Board is entitled to Eleventh Amendment immunity.
1. How State law defines a county board of education.
The Alabama Legislature has specifically defined and designated the responsibilities of a county board of education. In  16-8-1, Ala.Code 1975, the legislature provided that a county board of education "shall be composed of five members, who shall be elected by the qualified electors of the county." Section 16-1-30(b), Ala. Code 1975, provides that a county board of education shall determine its own written educational policy for the board and its employees and "shall prescribe rules and regulations for the conduct and management of the schools." A county board *988 of education is vested with the "general administration and supervision" of the schools in its county.  16-8-8, Ala.Code 1975. Specifically, a county board of education "may suspend or dismiss for immorality, misconduct in the office, ... or whenever, in the opinion of the board, the bests interests of the school require it, superintendents, principals, teachers, or any other employees...."  16-8-23, Ala.Code 1975. Likewise, a county board of education can transfer any teacher to a different position, school, or grade if the board determines a transfer is needed.  16-24-5, Ala.Code 1975. The legislature also specifically provided that a teacher subject to transfer or termination has the right to contest the board's decision by a hearing before the board.  16-24-6, Ala.Code 1975. Thus, the Board maintains significant authority with regard to the employment and conduct of its teachers; this factor lends little weight to the Board's being considered an "arm of the State" and thereby entitled to Eleventh Amendment immunity.
2. The degree of control the State maintains over the county board of education.
The Board argues that because the State superintendent of education has final, binding "authority to review actions and orders of county and city boards of education ... in matters relating to finance and other matters seriously affecting the educational interest," see  16-4-8, Ala.Code 1975, a county board of education is governed by and limited by the boundaries set by the State. The Board provides an extensive list of limitations placed on the authority of county boards of education. This Court, however, has specifically recognized:
"However broad may be the powers of the State Board of Education, ... we think it clear that the authority to exercise general control and supervision over the county ... boards of education does not include the authority to exercise the powers and authority which the Legislature has specifically conferred upon such local boards.
"....
"In regard to the authority to transfer or reassign teachers from one public school to another public school within a... county school system, it is conferred upon local boards of education...."
In re Opinion of the Justices No. 180, 276 Ala. 239, 241, 160 So.2d 648, 650 (1964).
Thus, because the legislature has specifically vested in county boards of education the authority to transfer, suspend, or dismiss teachers, this second factor does not weigh in favor of the Board's being considered an "arm of the State" and thereby entitled to Eleventh Amendment immunity.
3. Where the county board of education derives its funds.
The Board argues that because this Court has held that all public-school funds are State funds, whether collected at the State or the local level, we must conclude that this factor weighs heavily in favor of the Board's being considered an "arm of the State." See Mobile, Alabama-Pensacola, Florida Bldg. & Constr. Trades Council v. Williams, 331 So.2d 647, 648 (Ala.1976) (holding that regardless of whether the public-school funds come from the State treasury or from local taxation, public-school funds are State funds); and State v. Tuscaloosa County, 233 Ala. 611, 613, 172 So. 892, 894 (1937) ("[P]ublic school funds, as between the county and State, are State funds."). The fact that this Court has declared all public-school funds to be State funds does not address the question from where the Board derives its funds. Nothing properly before us indicates *989 the source of the Board's funds;[6] therefore, without any documentation to support this factor, we cannot conclude that it weighs in favor on the Board.
4. Who is responsible for judgments against the entity. The Board boldly asserts that, "[i]f all school funds are State funds, then any judgment against the Madison County Board of Education must be satisfied entirely from State funds allocated and intended for the education of students in Madison County." As with the third factor, such a general conclusion without any evidentiary support does not support the conclusion that any judgment against the Board would be payable out of the State treasury.
Thus, application of the Manders test to the facts before us does not support a finding that the Board has established a right to Eleventh Amendment immunity.
Before the United States Court of Appeals for the Eleventh Circuit developed the Manders test, the court addressed a situation similar to the one before us in Stewart v. Baldwin County Board of Education, 908 F.2d 1499 (11th Cir.1990). The court held that the Baldwin County Board of Education was not entitled to Eleventh Amendment immunity because the Baldwin County Board of Education was not acting as an arm or alter ego of the State. Recognizing that Eleventh Amendment immunity extended to an entity that was an arm of the State, the court noted that because the Baldwin County Board of Education managed its own funding, established the general policy for education in Baldwin County schools, administered and supervised education in the schools in Baldwin County, and was "subject to a significant amount of local control," 908 F.2d at 1511, the Baldwin County Board of Education could not be considered an arm of the State and therefore was not entitled to Eleventh Amendment immunity.
The Board argues in its application for rehearing that this Court should not find Stewart persuasive, in light of the holdings in McMillian and Regents of the University of California. However, we recognize that "[u]ltimately, of course, the question whether a particular state agency has the same kind of independent status as a county... is a question of federal law." Regents of the Univ. of California, 519 U.S. at 430 n. 5, 117 S.Ct. 900. Moreover, as the McMillian Court stated:
"[O]ur inquiry is dependent on an analysis of state law.... This is not to say that state law can answer the question for us by, for example, simply labeling as a state [agency] an [agency that] clearly makes county policy. But our understanding of the actual function of a governmental [agency], in a particular area, will necessarily be dependent on the definition of the [agency's] functions under relevant state law."
520 U.S. at 786, 117 S.Ct. 1734. Thus, because  1983 liability is determined by federal law, and because Stewart, which holds that a board of education is not entitled to Eleventh Amendment immunity, reflects what we understand to be the federal law with regard to the status of a county board of education and its authority to suspend, dismiss, or terminate a teacher, we conclude that the Board, which fulfills the same role for the schools in Madison County as the Baldwin County Board of Education does for the schools in Baldwin County, is also not an arm of the State for the purposes of  1983 liability and is *990 not entitled to Eleventh Amendment immunity.
Because the Board has not established that it is entitled to immunity from the  1983 claims, it has not established a clear legal right to a summary judgment on immunity grounds, and the petition for the writ of mandamus is denied in this regard.
Nash also contends that he has a clear legal right to a summary judgment on A.S.'s  1983 claim, because, he says, he is entitled to qualified immunity.
"`[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'
"Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). `Qualified immunity is designed to allow government officials to avoid the expense and disruption of going to trial, and is not merely a defense to liability.' Hardy v. Town of Hayneville, 50 F.Supp.2d 1176, 1189 (M.D.Ala.1999). `An official is entitled to qualified immunity if he is performing discretionary functions and his actions do "`not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"' Hardy, 50 F.Supp.2d at 1189 (quoting Lancaster v. Monroe County, 116 F.3d 1419, 1424 (11th Cir.1997))."
Ex parte Alabama Dep't of Youth Servs., 880 So.2d at 402.
First, we must determine whether A.S. has established a clear constitutional right to be safe from sexual abuse by a teacher while in school. In C.B. v. Bobo, 659 So.2d 98 (Ala.1995), this Court recognized:
"`If the Constitution protects a schoolchild against being tied to a chair or against arbitrary paddlings, then surely the Constitution protects a schoolchild from physical abuse ... by a public schoolteacher. ... It is uncontrovertible that bodily integrity is necessarily violated when a state actor sexually abuses a schoolchild and that such misconduct deprives the child of rights vouchsafed by the Fourteenth Amendment. Obviously, there is never any justification for sexually molesting a schoolchild, and thus, no state interest, analogous to the punitive and disciplinary objectives attendant to corporal punishment, which might support it.'"
659 So.2d at 103-04 (quoting Doe v. Taylor Indep. Sch. Dist., 15 F.3d 443, 450-52 (5th Cir.1994) (emphasis added in C.B.)).
A.S.'s complaint alleges a violation of her constitutional right to bodily integrity ÔÇö "to be free from sexual abuse and molestation." Nash recognizes that A.S. pleads this clearly established constitutional right, and he appears to concede that A.S.'s right to bodily integrity may have been violated by Reaves's actions.
Next, we must consider whether A.S. can establish that Nash acted with deliberate indifference to the violation of her constitutional right to bodily integrity. In Ray v. Foltz, 370 F.3d 1079 (11th Cir. 2004), the United States Court of Appeals for the Eleventh Circuit held that, to overcome qualified immunity, not only must the government official violate a clearly established statutory or constitutional right of the plaintiff, but the government official also must have acted with deliberate indifference to that right. The Court of Appeals stated:
"Deliberate indifference is not the same thing as negligence or carelessness. See Estelle v. Gamble, 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 *991 (1976). On the contrary, the Supreme Court has made clear that a state official acts with deliberate indifference only when he disregards a risk of harm of which he is actually aware. Farmer v. Brennan, 511 U.S. 825, 836, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (to be deliberately indifferent a state `official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference') (emphasis added). ...
"Following this guidance, we have stated that in order to establish deliberate indifference, plaintiffs must be able to [establish] that the defendant (1) was objectively aware of a risk of serious harm; (2) recklessly disregarded the risk of harm; and (3) this conduct was more than merely negligent. McElligott v. Foley, 182 F.3d 1248, 1255 (11th Cir. 1999)."
370 F.3d at 1083.
Nash contends that he presented substantial evidence indicating that he is entitled to qualified immunity because he was performing a discretionary function and because, he argues, his actions did not violate A.S.'s constitutional right.[7] Specifically, he maintains that a reasonable person would not view his actions as being deliberately indifferent to A.S.'s constitutional right to bodily integrity. A.S. contends that Nash demonstrated deliberate indifference to the risk of harm to the female students at the elementary school and to her specifically by his failure to recommend to the superintendent that Reaves's employment by the Madison County Board of Education be terminated. Specifically, she maintains that Nash had notice of the risk of harm to her and other female students "by allowing an employee, the defendant Reaves, to continue teaching and/or coaching with multiple complaints on his record for sexual harassment while taking no action to punish this pedophile or to stop this pedophile's sexual misconduct." Because A.S. alleges that Nash is individually liable for a constitutional injury caused directly by someone else, her claim against Nash rests on "supervisor liability."
"`"Supervisor liability [under  1983] occurs either when the supervisor personally participates in the alleged constitutional violation or when there is a causal connection between actions of the supervising official and the alleged constitutional deprivation. The causal connection can be established when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he [she] fails to do so. The deprivations that constitute widespread abuse sufficient to noti[fy] the supervising official must be obvious, flagrant, rampant, and of continued duration, rather than isolated occurrences."'
"Braddy v. Florida Dep't of Labor & Employment Sec., 133 F.3d 797, 802 (11th Cir.1998) (quoting Brown v. Crawford, 906 F.2d 667, 671 (11th Cir.1990) (citations omitted and emphasis added)). Accord George v. McIntosh-Wilson, 582 So.2d 1058, 1062-63 (Ala.1991)."
Ex parte Alabama Dep't of Youth Servs., 880 So.2d at 403.
In Doe ex rel. Doe v. City of Roseville, 296 F.3d 431 (6th Cir.2002), the United States Court of Appeals for the Sixth Circuit confronted a factual situation similar to the one now before this Court. In Roseville, a female elementary-school student *992 alleged that she had been abused by one of her male elementary-school teachers in 1992. The teacher had had complaints alleged against him throughout his teaching career. During the 1975-76 and 1976-77 school years, several girls alleged that the teacher had touched them inappropriately. The teacher received an oral warning. The teacher was transferred to a different elementary school, and in 1979 the superintendent was notified that the teacher had fondled four sixth-grade girls. The superintendent investigated, concluded that the teacher had used "poor judgment," placed a sealed letter of reprimand in his file, and transferred him to yet another school. No additional allegations of improper behavior were made until 1988 when several girls reported that the teacher had touched them inappropriately. The superintendent conducted another investigation and issued a letter of reprimand. Additionally, the superintendent contacted the board of education and the district attorney, informing them of the two incidents requiring a letter of reprimand. The teacher was again transferred, and in 1992 and 1993 the special-education student who was the plaintiff in the Roseville case was allegedly sexually abused. "The abuse included [the teacher's] removing her clothing; touching her private parts with his hands and penetrating her vagina with his fingers; taking her into the boys' bathroom and, while wearing [a] mask, tying her wrists with rope, gagging her, hanging her from a hook on the door and hitting her with a small wooden bat; and... while again wearing a mask, putting his fingers in her vagina and slapping her face." 296 F.3d at 435-36. The student did not immediately report the abuse, but informed her parents of it in 1994, almost a year after a criminal investigation had been initiated against the teacher regarding another unrelated incident of sexual abuse against a neighbor of the teacher's.
The student sued several entities and individuals involved in employing and supervising the teacher, including the superintendent who investigated the incidents, asserting, among other claims, a  1983 claim. In determining whether the supervisors were immune from the  1983 claim, the Court of Appeals recognized that
"it is not enough for the plaintiff to show that the defendant supervisors were sloppy, reckless or negligent in the performance of their duties. Rather, ... `[a] plaintiff must show that, in light of the information defendants possessed, the teacher who engaged in sexual abuse showed a strong likelihood that he would attempt to sexually abuse other students, such that the failure to take adequate precautions amounted to deliberate indifference to the constitutional rights of the students.'... Put another way, we said, the plaintiff must show that the `defendants' conduct amounted to a tacit authorization of the abuse.'"
296 F.3d at 439.
The court in Roseville acknowledged that the conduct of the supervisors was "disturbing," but it held that their acts did not constitute participation in or knowing acquiescence to the abuse. Noting that the teacher's actions were sporadic ÔÇö occurring in 1976 and then not until 1988, more than 10 years apart ÔÇö the court concluded that the supervisors were not confronted with conduct that was "`obvious, flagrant, rampant, and of continued duration.'" 296 F.3d at 440 (quoting Braddy v. Florida Dep't of Labor & Employment Sec., 133 F.3d 797, 802 (11th Cir.1998)). The court then stated:
"Viewed from the perspective of the twenty-first century, the responses of [the supervisors] to reports of [the teacher's] conduct are disturbing. *993 Hindsight reveals that [the teacher] was a pedophile. But our task is not to reconstruct the reality of [the teacher's] proclivities. Our task is to determine whether [the supervisors] were confronted with conduct that was `obvious, flagrant, rampant, and of continued duration, rather than isolated occurrences,'... or with `such a widespread pattern of constitutional violations' ... that their actions demonstrated deliberate indifference to the danger of [the teacher's] sexually abusing students. We hold that they were not. We cannot weave the threads of such a pattern on the loom of hindsight, and the facts as [the student] portrays them do not demonstrate anything more than negligence on the part of these defendants. Although [the student] had a constitutional right to be free from sexual abuse at the hands of a school teacher or official, she did not have a constitutional right to be free from negligence in the supervision of the teacher who is alleged to have actually abused her. Negligence is not enough to impose section 1983 liability on a supervisor."
296 F.3d at 440-41. The court then held that the supervisors were entitled to qualified immunity.
Like the Court of Appeals for the Sixth Circuit in Roseville, we conclude that Nash's actions were at most negligent and that he is entitled to qualified immunity. Nash presented substantial evidence indicating that the previous incidents of misconduct by Reaves were not "obvious, flagrant, rampant, and of continued duration," but were 5 isolated occurrences over a 16-year period that did not provide a basis for terminating Reaves's employment or provide him with sufficient notice that Reaves would seriously harm A.S.[8] A.S. relies on the facts that Nash had knowledge of the past incidents involving Reaves, that he had investigated the incidents and believed the female students' claims of misconduct by Reaves, and that he had failed to recommend to the Board or to other Board officials after investigating those incidents that Reaves's employment be terminated; these instances, however, do not amount to deliberate indifference but to, at most, negligence. As the Court of Appeals for the Sixth Circuit recognized, we cannot use hindsight to conclude that Nash inferred from these incidents that Reaves posed a substantial risk of harm to the female students. Thus, because Nash has established a clear legal right to qualified immunity, he is entitled to a summary judgment on A.S.'s  1983 claim. Therefore, Nash has shown a clear legal right to a dismissal of A.S.'s  1983 claim on the ground of federal qualified immunity.

Conclusion
Because the Board has failed to establish that it is entitled to immunity, we deny the petition as to it. Nash, however, has established that he is entitled to immunity on A.S.'s  1983 claim; therefore, he has established a clear legal right to the dismissal of that claim, and the trial court is directed to enter a summary judgment in favor of Nash on A.S.'s  1983 claim.
APPLICATION OVERRULED; OPINION OF MARCH 14, 2008, WITHDRAWN; OPINION SUBSTITUTED; *994 PETITION GRANTED IN PART AND DENIED IN PART; WRIT ISSUED.
COBB, C.J., and SEE, LYONS, WOODALL, SMITH, and BOLIN, JJ., concur.
STUART, J., concurs specially.
PARKER and MURDOCK, JJ., concur in the result.
STUART, Justice (concurring specially).
I recognize that whether the Madison County Board of Education ("the Board") is an "arm of the State" and is thus entitled to immunity under the Eleventh Amendment to the United States Constitution for a 42 U.S.C.  1983 claim is a question of federal law. I further recognize that under current federal law a board of education is not entitled to Eleventh Amendment immunity; that the Board is not entitled to Eleventh Amendment immunity; and that, consequently, the Board has not established a clear legal right to a summary judgment on this ground. I also recognize that this Court does not review a denial of a summary judgment by a petition for a writ of mandamus unless an exception applies. See Liberty Nat'l Life Ins. Co., 825 So.2d 758, 761-62 (Ala.2002) ("[B]ecause an `adequate remedy' exists by way of an appeal, the denial of a motion to dismiss or a motion for a summary judgment is not reviewable by petition for writ of mandamus."). I write specially to state that my review of the materials submitted to this Court indicates that the Board is entitled to a summary judgment on the merits. The Board presented substantial evidence indicating that there was not a genuine issue of material fact with regard to A.S.'s  1983 claim. A.S. did not establish otherwise. Therefore, if I had been the trial judge, I would have granted the Board's summary-judgment motion.
MURDOCK, Justice (concurring in the result).
"There is no area of the law which is more confusing than qualified immunity, unless it is that of deliberate indifference."
 Judge Robert Propst
 Flowers v. Bennett,
 123 F.Supp.2d 595, 601
 (N.D.Ala.2000).
Before conducting research in an effort to understand the issue presented in the present case, my vote for the most confusing area of the law likely would have gone to that area of Alabama state law dealing with "sovereign immunity" (or at least to the manner in which this Court has sometimes applied that law). See generally Alabama Dep't of Transp. v. Harbert Int'l, Inc., 990 So.2d 831, 847 (Ala.2008) (Murdock, J., concurring specially) (addressing so-called "State immunity"); Ex parte Randall, 971 So.2d 652, 669 (Ala.2007) (Murdock, J., dissenting) (addressing so-called "State-agent immunity"). After reading quite a number of federal cases dealing with Eleventh Amendment immunity, however, I am now amenable to the suggestion that Judge Propst has identified more deserving candidates.
The United States Supreme Court has stated that the issue of qualified immunity turns on two questions: (1) whether the defendant was performing a discretionary function and (2) whether the defendant's conduct violated clearly established statutory or constitutional rights. As the Court held in Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982): "[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have *995 known." The latter question, itself, has been examined in two parts: (a) "`[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?'" and, (b) if so, was "`the right ... clearly established ... in light of the specific context of the case'"? Scott v. Harris, 550 U.S. 372, 127 S.Ct. 1769, 1774, 167 L.Ed.2d 686 (2007) (quoting Saucier v. Katz, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001)). Despite these holdings, under the approach utilized by the United States Court of Appeals for the Eleventh Circuit in Ray v. Foltz, 370 F.3d 1079 (11th Cir.2004), and accepted by the main opinion, the issue whether a state official has acted with "deliberate indifference," rather than merely innocently or negligently, must somehow be spliced onto the immunity analysis.
The main opinion quotes the Harlow v. Fitzgerald standard as part of a longer passage from this Court's opinion several years ago in Ex parte Alabama Department of Youth Services, 880 So.2d at 393, 402-03 (Ala.2003). 1 So.3d at 990. Without any predicate explanation of how, or even whether, the concept of "deliberate indifference" is properly part of the qualified-immunity analysis, the main opinion then states that,
"[i]n Ray v. Foltz, 370 F.3d 1079 (11th Cir.2004), the United States Court of Appeals for the Eleventh Circuit held that, to overcome qualified immunity, not only must the government official violate a clearly established statutory or constitutional right of the plaintiff, but the government official also must have acted with deliberate indifference to that right."
1 So.3d at 990-91 (emphasis added). In this regard, the approach reflected in the main opinion seems little or no different than that in Ray v. Foltz itself.[9] As a result, and because the arguments of both parties in this case are based on this approach, I accept this approach for purposes of the present case. On that basis, I *996 concur in the result reached by the main opinion as to Nash.
I also concur in the result reached by the main opinion as to the Madison County Board of Education.
NOTES
[1] Nash did not participate in the investigations of the first reported incident in 1986 or the fourth reported incident in 1996.
[2] It is unclear from the materials submitted to this Court whether this incident occurred before or after the alleged rape of A.S.
[3] According to the materials before this Court, criminal charges were filed against Reaves but were subsequently dropped.
[4] A.S. argues the Board waived any immunity it might have had because the Board did not present the defense of immunity to the trial court as a ground for summary judgment. We, however, need not determine whether the Board waived the ground of immunity because federal immunity is not available to the Board.
[5] The Eleventh Amendment to the United States Constitution states: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against any one of the United States by Citizens of another State or by Citizens or Subjects of any Foreign State."
[6] The Board in its brief on application for rehearing provided information from the Alabama Education Department, Annual Report 2004, indicating that in 2004 the Board received 54.24% of its funding from the State. This information, however, is contained in the argument of counsel and is not supported by any documentation.
[7] The parties agree that Nash was performing a discretionary function; therefore, our focus is solely on whether Nash's actions violated A.S.'s constitutional right.
[8] Nash was involved in investigating only two incidents ÔÇö the 1990 and 1991 incidents ÔÇö before the incident involving A.S. Nash's investigation of the 1991 incident, which involved revisiting the 1990 incident, resulted in meetings with various school officials, including the superintendent, to discuss whether a recommendation should be made to the Board to terminate Reaves's employment.
[9] In Ray v. Foltz, the Court of Appeals for the Eleventh Circuit quoted the "clearly established constitutional right" standard from Harlow v. Fitzgerald and concluded that the constitutional right violated in that case was a clearly established one. The opinion then moved to the issue of "deliberate indifference" (which, if not for the manner in which it is discussed in Ray v. Foltz and some other cases, I would have assumed was simply a substantive, scienter element of the underlying constitutional/ 1983 action), without explaining how that concept relates to the above-stated elements of the qualified-immunity defense. Nevertheless, the manner in which the court organized its opinion does suggest that the issue of deliberate indifference is to be considered in the context of a qualified-immunity analysis. 370 F.3d at 1081-85 (Part II).

Ray v. Foltz relied heavily upon the discussion of deliberate indifference in Taylor v. Ledbetter, 818 F.2d 791 (11th Cir.1987) (en banc). The discussion in Taylor, however, does not appear to be anything more than a discussion of an element of the underlying cause of action. I also note that in Williams v. Board of Regents of University System of Georgia, 477 F.3d 1282, 1300 (11th Cir.2007), a case, like the present case, involving supervisor liability, the Court of Appeals for the Eleventh Circuit discusses the deliberate-indifference standard as a substantive element of the causes of action under Title IX and  1983. 477 F.3d at 1295-97 (Part II.B.3). The opinion in Williams makes no reference to the concept of deliberate indifference in its separate discussion of qualified immunity. As to that issue, the opinion focuses solely on whether the defendant was "executing a discretionary responsibility" and, if so, whether the right of the plaintiff that was violated was a "`clearly established statutory or constitutional right[] of which a reasonable person would have known,'" consistent with the above-discussed United States Supreme Court cases. 477 F.3d at 1300-02 (Part III.B and III.C) (quoting Courson v. McMillian, 939 F.2d 1479, 1486 (11th Cir.1991)). Compare Saucier v. Katz, supra.