WOODALL, Justice.
In the late night hours of March 5 or the early morning hours of March 6, 2004, 19-year-old J.B.,[1] a member of the Lawson State Community College (“Lawson State”) women’s basketball team, was raped in a motel room by one of her basketball coaches, Boris A. McCord, a long-time acquaintance, after an away game. She brought this action (1) against Lawson State, pursuant to Title IX of the Education Amendments of 1972, § 909, as amended, 20 U.S.C. §§ 1681-1688; and (2) against McCord’s alleged supervisors, namely, Dr. Perry Ward, Eleanor Pitts, and Aubrey Wiley, the president, the athletic director, and the head women’s basketball coach, respectively, of Lawson State (hereinafter referred to collectively *167 as “the supervisors”), pursuant to 42 U.S.C. § 1983, seeking compensatory and punitive damages. The trial court entered a summary judgment for Lawson State and the supervisors, and J.B. appeals. We affirm.

I. Legal Framework

“Title IX provides in pertinent part: ‘No person ... shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.’ ” Gebser v. Lago Vista Indep. Sch. Dist., 524 U.S. 274, 280, 118 S.Ct. 1989, 141 L.Ed.2d 277 (1998) (quoting 20 U.S.C. § 1681(a)). It affords a private right of action for “damages in cases involving a teacher’s sexual harassment of a student,” 524 U.S. at 281, 118 S.Ct. 1989, but only where “an official of the school ... who at a minimum has authority to institute corrective measures on the [school’s] behalf has actual notice of, and is deliberately indifferent to, the teacher’s misconduct.” 524 U.S. at 277, 118 S.Ct. 1989 (emphasis added).
Similarly, supervisory liability under § 1983 turns on whether, “ ‘in light of the information [the supervisor's] possessed, the teacher who engaged in sexual abuse showed a strong likelihood that he would attempt to sexually abuse other students, such that the failure to take adequate precautions amounted to deliberate indifference to the constitutional rights of the students.’ ” Ex parte Madison County Bd. of Educ., 1 So.3d 980, 992 (Ala.2008) (quoting Doe ex rel. Doe v. City of Roseville, 296 F.3d 431, 439 (6th Cir.2002)). Thus, an issue dispositive of either claim is whether the actions or inaction of the supervisors or Lawson State of which J.B. complains as the basis of her claims amounted to deliberate indifference to the danger posed to her by McCord.

II. Facttial Baclcgnmnd

The fact pattern out of which this case arises involves such details regarding McCord’s background as were known by the supervisors, as well as by J.B. herself. According to Pitts, Pitts was head women’s basketball coach at Lawson State in 2002. Her duties included recruiting prospective student athletes for the basketball team, as well as overseeing the scheduling and administration of all practices and games and supervising assistant coaches and voluntary assistants.
During the 2002-2003 basketball season, McCord assisted Pitts “on a voluntary, part-time basis” with, among other things, the “administration of practices.” Pitts had known McCord and one or more of his family members for several years and had heard from them that McCord had, at sometime predating his employment history, “been in jail related to the death of a child.” Her understanding was that he had taken “ ‘the fall’ for a companion.”[2] She never discussed the matter with McCord.
During the 2002-2003 basketball season, Pitts learned — according to her affidavit and deposition testimony — that McCord had allegedly touched S.P., a female student on the basketball team, “in a manner that made her feel uncomfortable during the middle of a practice drill.” More specifically, Pitts stated that, on the day of the alleged incident, S.P. approached Pitts and personally informed her of the matter as Pitts was coming out of her office. Pitts stated that she “immediately” questioned McCord, who said that the touch was only “incidental as part of the practice drill.” Pitts said that she questioned “the other *168 players” and “strongly warned [McCord] that such conduct was not acceptable and [would] not be tolerated.” Subsequently, according to Pitts, she informed S.P. of the actions she had taken and S.P. indicated that she “was satisfied with that.” Neither S.P. nor any of her teammates have any recollection of this incident or of Pitts’s alleged follow-up, which will hereinafter be referred to as “the 2002 incident.”
In 2003, McCord was offered and accepted employment by Lawson State as assistant women’s basketball coach. In so doing, he replaced Aubrey Wiley, who, in turn, replaced Pitts as head women’s basketball coach, when Pitts moved into the position of chair of the Department of Health and Physical Education; Pitts later became athletic director.
In early 2004, during the 2003-200⅛ basketball season, McCord allegedly touched S.P. on the backside before a basketball game as she was standing on a weight scale. S.P. testified by deposition that she confronted McCord and asked him if the touch was intentional, and he admitted that it was. She was angry and immediately expressed her anger to a number of her teammates. However, according to the testimony of S.P. and her teammates, neither she nor they reported the incident to any official for Lawson State. The alleged touching on this occasion will be referred to hereinafter as “the 2003 incident.”
Meanwhile, in the fall of 2003, J.B., a graduate of Woodlawn High School (“Woodlawn”), accepted a basketball scholarship to attend Lawson State. The scholarship offer was McCord’s idea; McCord had been J.B.’s basketball coach at Wood-lawn for three years before her high-school graduation. While she was in high school, J.B. and her team had played a number of away games, chauffeured by McCord, that required overnight stays. Also, J.B. traveled — “a lot” — with McCord and other members of his family to watch McCord’s daughter play basketball for Alabama A & M University.
Throughout the 2003-2004 basketball season at Lawson State, McCord regularly chauffeured J.B. to and from classes, sometimes accompanied bjr his fiancée. J.B. also spent time with McCord at his home, visiting with his fiancée and her daughter. Pitts and Wiley were aware of these activities. Pitts and Wiley both felt some concern regarding the amount of time J.B. and McCord were spending together, and they questioned the nature of the relationship. Wiley discussed the matter with Pitts, who exjoressed the view that J.B. was “grown” and that Pitts and Wiley could not control events that happened off campus. Wiley also discussed the relationship with J.B. and McCord, both of whom denied that the relationship was a sexual one.
At that time, Lawson State — through (1) the “Lawson State Community College Student Catalog” (“the catalog”) and (2) the “Lawson State Community College Student Handbook” (“the handbook”)— distributed to students information regarding its policy on sexual harassment. Specifically, the catalog stated:
“Lawson State ... is committed to protect all persons from sexual harassment, intimidation, and exploitation of its students, staff, and campus visitors as prohibited by Title IX of the Education Amendments of 1972 and of Title VII (Section 703) of the Civil Rights Act of 1964.”
In that connection, the handbook stated:
“It is the policy of Lawson State Community College to maintain a learning and working environment that is free from sexual harassment. It shall be a violation of this policy for any member *169 of the college’s staff to harass another staff member or student through conduct or communication of a sexual nature as defined below. It shall also be a violation of this policy for students to harass other students through conduct or communications of a sexual nature as defined below.

“Definition

“Sexual harassment shall consist of unwelcome sexual advances, requests for sexual favors, and other inappropriate verbal or physical conduct of a sexual nature when made by any member of the school’s staff to a student, when made by any of the school’s staff to another staff member or when made by any student to another student when:
“• Submission to such conduct is made either explicitly or implicitly a term or condition of an individual’s employment or education, or when:
“•Submission to or rejection of such conduct by an individual is used as the basis for academic or employment decisions affecting that individual, or when:
“• Such conduct has the purpose or effect of substantially interfering with an individual’s academic or professional performance or creating an intimidating, hostile, or offensive employment or education environment.
“Sexual harassment, as set forth above, may include, but is not limited to the following:
“• Verbal harassment or abuse
“• Pressure for sexual activity
“• Repeated remarks to a person, with sexual or demeaning implications
“• Unwelcomed touching
“• Suggesting or demanding sexual involvement accompanied by implied or explicit threats concerning one’s grades, job, etc.”
Lawson State is also subject to the sexual-harassment policy promulgated by the Alabama State Board of Education. State Board Policy 601.04 (“the policy”), in effect during the 2003-2004 academic year, provided, in pertinent part: “Sexual harassment is distinguished from consenting or welcome sexual relationships by the introduction of the elements of coercion; threat; unwelcome sexual advances; unwelcome requests for sexual favors; other unwelcome sexually explicit or suggestively written verbal or physical conduct .... ” (Emphasis added.)
The policy provided detailed procedures for reporting and resolving sexual-harassment complaints. In particular, any complaint was to be in writing and was to be referred to the “president of the institution and the Vice Chancellor for Legal and Human Resources” (“the vice chancellor”). The vice chancellor was to be “kept informed regarding the progress and results of the investigation of the complaint.” Although the policy provided for both “formal” and “informal” resolution of a sexual-harassment complaint, it provided that, at a minimum, “[i]f the results of the investigation and informal resolution of the complaint are accepted by the alleged victim and he or she desires no further action against the alleged harasser, the complainant will sign a statement requesting that no further action be taken.”
However, it is undisputed that J.B. did not complain to anyone at Lawson State about her relationship with McCord. On the contrary, according to J.B., she had come to regard McCord as a friend and “father figure,” never felt that he had acted inappropriately toward her, and, until the night of March 5-6, 2004, never suspected that he might harm her. Nevertheless, on that night, McCord raped J.B. in his motel room after a Lawson State basketball game. He was subsequently *170 convicted of the crime and sentenced to imprisonment for life plus 20 years.
J.B. sued Lawson State under Title IX and sued the supervisors under 42 U.S.C. § 1983. As last amended, the complaint alleged, among other things, that Lawson State and the supervisors had “knowledge of the sexual and hostile education environment and sexual abuse and harassment to which J.B. and others were subjected at the hands of Boris McCord, and [that] their failure to respond and/or their inadequate response amounted to deliberate indifference,” which indifference “had the effect of denying [J.B.] access to educational opportunities provided by the school.” It further alleged that J.B.’s “rights to personal safety and bodily integrity [as] guaranteed by the Fourteenth Amendment ... were violated when [Lawson State] and [the supervisors] failed to prevent Boris McCord from raping ... her.” Lawson State and the supervisors filed a joint motion for a summary judgment, asserting, among other things, qualified immunity as an affirmative defense to the § 1983 claims. The trial court granted the motion, and J.B. appealed.

III. Discussion

“In their individual capacities, ... state officials may be liable for damages resulting from discretionary acts that violate ‘clearly established statutory or constitutional rights of which a reasonable person would have known.’ Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). ‘Good-faith’ or ‘qualified’ immunity is available as an affirmative defense to a wide variety of public officials. Id. at 815, 102 S.Ct. at 2736; Schuck, Suing Our Servants: The Court, Congress, and the Liability of Public Officials for Damages, 1980 Sup.Ct. Rev. 281, 293-95. In order to defeat a qualified immunity defense, the plaintiff ‘bears the burden of showing that “the legal norms allegedly violated by the defendant were clearly established at the time of the challenged actions.” ’ Barts v. Joyner, 865 F.2d 1187, 1190 (11th Cir.) (quoting Mitchell v. Forsyth, 472 U.S. 511, 528, 105 S.Ct. 2806, 2816, 86 L.Ed.2d 411 (1985)), cert. denied, 493 U.S. 831, 110 S.Ct. 101, 107 L.Ed.2d 65 (1989); see also Feagley v. Waddill, 868 F.2d 1437, 1439 (5th Cir.1989); Rich v. Dollar, 841 F.2d 1558, 1564 (11th Cir.1988); Zeigler v. Jackson, 716 F.2d 847, 849 (11th Cir.1983). Only if a state official exhibits deliberate indifference to his official duties may he be liable for damages under § 1983.”
George v. McIntosh-Wilson, 582 So.2d 1058, 1061 (Ala.1991) (emphasis and footnote omitted).
“Supervisory liability [under § 1983] occurs either when the supervisor personally participates in the alleged constitutional violation or when there is a causal connection between actions of the supervising official and the alleged constitutional deprivation. Lewis v. Smith, 855 F.2d 736, 738 (11th Cir.1988) (per curiam); ... Wilson v. Attaway, 757 F.2d 1227, 1241 (11th Cir.1985). The causal connection can be established when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so. See Clark v. Evans, 840 F.2d 876, 885 (11th Cir.1988) (per curiam); ... Wilson, 757 F.2d at 1241. The deprivations that constitute widespread abuse sufficient to notify the supervising official must be obvious, flagrant, rampant and of continued duration, rather than isolated occurrences.”
Brown v. Crawford, 906 F.2d 667, 671 (11th Cir.1990).
On appeal, J.B. contends that “Pitts was deliberately indifferent to the *171 risk of harm presented by allowing McCord to coach young college girls.”[3] J.B.’s brief, at 34. J.B. does not allege that anyone but Pitts was an “official of the school ... [having] authority to institute corrective measures on the [school’s] behalf,” under the Title IX standard set forth in Gebser, 524 U.S. at 277, 118 S.Ct. 1989. Indeed, the merits of both J.B.’s federal claims turn chiefly on Pitts’s allegedly inappropriate — or inadequate — action.

A. Pitts’s Conduct

J.B. faults Pitts’s performance in essentially two respects. First, she contends that Pitts failed to conduct any investigation into the 2003 incident involving McCord and S.P. Second, according to J.B., Pitts failed to conduct an “investigation [of the] long-standing McCord/J.B. inappropriate relationship,” of which Pitts was aware. J.B.’s brief, at 64.

1. S.P.

In this connection, J.B. makes the peculiar argument that she produced substantial evidence of Pitts’s utter failure to investigate McCord’s inappropriate touching of S.P., which occurred before the event forming the basis of this case. Specifically, she contends that “Pitts never conducted any investigation whatsoever in the S.P. incident.” J.B.’s brief, at 63. This argument is peculiar in light of the odd disconnect in the evidence of McCord’s alleged touching of S.P. S.P. testified unequivocally that the touching occurred during the 2003-2004 season, not during the 2002-2003 season, as Pitts remembers. In fact, S.P. stated that she had never met McCord before the summer of 2003 — after the 2002 incident is alleged to have occurred. Most significantly, S.P. testified that she never told Pitts or anyone else in the administration at Lawson State about the touching that formed the basis of the 2003 incident. S.P.’s friends who knew of the 2003 incident testified similarly, that is, that they never told any Lawson State official about the 2003 incident.
The only evidence indicating that Pitts knew of an inappropriate touching came from Pitts, herself, and she testified that she promptly investigated the incident to her satisfaction and to the satisfaction of the complainant. Thus, the evidence produces two disconnected scenarios, namely the 2002 incident and the 2003 incident. Indeed, J.B. concedes as much by arguing that “Pitts has obviously confused another inappropriate touching by McCord involving another teammate of J.B.’s that occurred during a practice drill during a different basketball season.” J.B.’s reply brief, at 5 (emphasis added).
Neither scenario, however, aids J.B. Under one scenario, Pitts did investigate; under the other scenario, Pitts was never apprised of the need to investigate. Thus, there was no evidence indicating that Pitts ignored a report of sexual impropriety or that she was deliberately indifferent to the risk of harm to an athlete in not conducting an investigation of a sexual impropriety.
To be sure, it is uncontroverted that the investigatory procedures outlined in the policy were not followed. In other words, even under Pitts’s version of events, there was no paper trail of the investigation. Neither the “president of the institution” nor the vice chancellor was ever informed of the alleged complaint against McCord. Neither did the complainant “sign a state *172 ment requesting that no further action be taken.” Such deviations from the policy are arguably negligent.
Howevei', “ ‘[njegligence is not enough to impose [either] section 1983 [or Title IX] liability ....”’ Ex parte Madison County Bd. of Educ., 1 So.3d at 993 (quoting Roseville, 296 F.3d at 441); see Davis v. Monroe County Bd. of Educ., 526 U.S. 629, 642, 119 S.Ct. 1661, 143 L.Ed.2d 839 (1999) (“Likewise, [in Gebser v. Lago Vista Independent School District, 524 U.S. 274 (1998), a Title IX case,] we declined the invitation to impose liability under what amounted to a negligence standard — holding the district liable for its faitee to react to teacher-student harassment of which it knew or should have known.”). “ ‘[I]t is not enough for the plaintiff to show that the defendant supervisors were sloppy, reckless or negligent in the performance of their duties.’ ” Ex parte Madison County Bd. of Educ., 1 So.3d at 992 (quoting Roseville, 296 F.3d at 439 (emphasis added)). Otherwise stated, J.B. “ ‘did not have a constitutional right to be free from negligence in the supervision of the [coach] who ... abused her.’ ” 1 So.3d at 993 (quoting Roseville, 296 F.3d at 441 (emphasis added)). See also W.L.O. v. Smith, 585 So.2d 22, 25 (Ala.1991) (“[T]he Due Process Clause of the Fourteenth Amendment serves as a limitation on the States’ power to act, and cannot be read as a guarantee of protection from the criminal acts of third parties.”) (construing DeShaney v. Winnebago County Dep’t of Soc. Servs., 489 U.S. 189, 196-97, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989)).
“ ‘A state official acts with deliberate indifference only when [she] disregards a risk of harm of which [she] is actually aware.”’ Ex parte Madison County Bd. of Educ., 1 So.3d at 991 (quoting Ray v. Foltz, 370 F.3d 1079, 1083 (11th Cir.2004)(emphasis added in Ex parte Madison County Bd. of Educ.)). This standard is satisfied when a supervisor is “ ‘confronted [1] with conduct that [is] “obvious, flagrant, rampant, and of [continued] duration,” ... or [2] with “... a widespread pattern of constitutional violations.” ’ ” Ex parte Madison County Bd. of Educ., 1 So.3d at 993 (quoting Roseville, 296 F.3d at 440-41, quoting in turn Braddy v. Florida Dep’t of Labor & Employment Sec., 133 F.3d 797, 802 (11th Cir. 1998), and Doe v. Claiborne County, 103 F.3d 495, 513 (6th Cir.1996)). Even multiple instances of misconduct may be insufficient, however, where the instances are “sporadic” or “isolated” by substantial chronological intervals and accompanied by investigations. Ex parte Madison County Bd. of Educ., 1 So.3d at 992-93. See Doe v. Taylor Indep. Sch. Dist., 15 F.3d 443, 456 n. 12 (5th Cir.1994) (noting that the deliberate-indifference standard may preclude liability for “many good faith but ineffective responses,” such as “warning the state actor, notifying the student’s parents, or removing the student from the teacher’s class”).
Roseville, for example, involved the following facts:
“[A] female elementary-school student alleged that she had been abused by one of her male elementary-school teachers in 1992. The teacher had had complaints alleged against him throughout his teaching career. During the 1975-76 and 1976-77 school years, several girls alleged that the teacher had touched them inappropriately. The teacher received an oral warning. The teacher was transferred to a different elementary school, and in 1979 the superintendent was notified that the teacher had fondled four sixth-grade girls. The superintendent investigated, concluded that the teacher had used ‘poor *173 judgment/ placed a sealed letter of reprimand in his file, and transferred him to yet another school. No additional allegations of improper behavior were made until 1988 when several girls reported that the teacher had touched them inappropriately. The superintendent conducted another investigation and issued a letter of reprimand. Additionally, the superintendent contacted the board of education and the district attorney, informing them of the two incidents requiring a letter of reprimand. The teacher was again transferred, and in 1992 and 1993 the special-education student who was the plaintiff in the Roseville case was allegedly sexually abused.”
Ex parte Madison County Bd. of Educ., 1 So.3d at 991-92 (discussing Roseville) (emphasis added).
As in this case, the plaintiff in Roseville alleged that school officials, including the superintendent, had violated her constitutional right to bodily integrity “by failing to take appropriate action in response to reports of [the teacher’s] alleged abuse of children other than [the plaintiff].” 296 F.3d at 439. Two of the instances of alleged misconduct were reported to the superintendent, who investigated the allegations. Similarly, in this case, the facts, when construed most favorable to J.B., show that S.P. complained to Pitts of an inappropriate touching by McCord and that Pitts investigated the matter.
“The court in Roseville acknowledged that the conduct of the supervisors was ‘disturbing/ ” but it noted that the “teacher’s actions were sporadic — occurring in 1976 and then not until 1988, more than 10 years apart.” Ex parte Madison County Bd. of Educ., 1 So.3d at 992. Ultimately, the court in Roseville held that the allegations were insufficient as a matter of law to establish deliberate indifference on the part of the officials. 296 F.3d at 441.
Similarly, in Ex parte Madison County, this Court determined that 5 alleged instances of sexual abuse of different female students by a teacher over a 16-year period were isolated occurrences, not amounting to notice to Jim Nash, personnel director for the Madison County Board of Education, that his failure to recommend the teacher’s dismissal subjected the plaintiff, who was also abused by the teacher, to the likelihood of a constitutional deprivation. All five instances had been investigated by school officials. “Nash was aware of three of the five investigations at the time they were being conducted,” 1 So.3d at 984, and personally investigated two of the instances of sexual abuse. Id. Explaining that the teacher’s previous instances of sexual abuse were not so “obvious, flagrant, rampant, and of continued duration” as to “provide [Nash] with sufficient notice that [the teacher] would seriously harm [the plaintiff],” we held that, as a matter of law, Nash had not been deliberately indifferent to the constitutional rights of the plaintiff. 1 So.3d at 993.
J.B. attempts to distinguish Ex parte Madison County, contending that, unlike Nash, who investigated allegations of abuse, Pitts “did nothing after learning of McCord’s inappropriate conduct.” J.B.’s brief, at 69 (emphasis added). This contention is without merit. As noted previously, although J.B.’s theory of liability is premised on the complete absence of an investigation, rather than a mere negligent investigation, this is not such a case. There is no evidence indicating that Pitts failed to investigate an allegation of which she was apprised. The only evidence is that Pitts did investigate — -albeit, arguably negligently — an allegation of inappropriate touching in the 2002 incident. See also Sauls v. Pierce County Sch. Dist., 399 *174 F.3d 1279 (11th Cir.2005) (holding that school district was not deliberately indifferent to reports of sexual harassment where each complaint was followed by an investigation). For these reasons, the 2002 incident, even in light of McCord’s 1987 conviction for manslaughter, of which Pitts also had knowledge, did not constitute obvious, flagrant, or continued misconduct for purposes of the deliberate-indifference standard.
J.B. relies on George v. McIntosh-Wilson, 582 So.2d 1058 (Ala.1991). However, that case is easily distinguishable. George arose out of the death of Andre George, a “profoundly retarded resident” of Partlow State School and Hospital (“the hospital”), who “suffocated on a surgical glove that he ingested while unattended by hospital personnel.” 582 So.2d at 1059. It involved a claim under 42 U.S.C. § 1983 against, among others, Earnell McIntosh-Wilson, the chief executive officer of the hospital. Id. McIntosh-Wilson was a “policy-making administrator[ ] ... liable for the constitutional deprivations caused by [her] subordinates if [she] exhibited such a degree of indifference to compliance with [her] policies as to demonstrate that [she] did not base [her] actual administrative decisions or actions on the professional judgments embodied in the policy.” 582 So.2d at 1063 (emphasis added). There was evidence of such indifference in George.
It was undisputed that George had a notorious “habit of chewing and ‘mouthing’ anything within his reach, including towels, rags, his clothing or the clothing of others.” 582 So.2d at 1059. It was further undisputed that the hospital had purported to address his habit by “formulating] procedures for [his] habilitation,” including a “90-day ‘behavioral management plan,’ ” and “an ‘individual habilitation plan.’ ” 582 So.2d at 1060. There was expert testimony, however, tending to show that the procedures were “paper policies]” only, that is, that they “were more illusory than real.” 582 So.2d at 1063.
The policy at issue in this case was instituted, not by Pitts, but by the State Board of Education. What was known in George was the chronic and life-threatening behavior of a profoundly retarded hospital patient, while here, it is the two, widely separated, dissimilar instances of misconduct by a basketball coach — an offensive touching and a rape. Thus, George does not aid J.B.
.¾. The J.B./McCord Relationship
J.B. also complains of Pitts’s decision not to intervene in her long-standing, personal relationship with McCord. Although she undisputedly never complained to Pitts or anyone else about McCord until the event made the basis of this action, she now insists that Pitts should have interpreted McCord’s attentions as sexual harassment and should have unilaterally initiated the procedures for addressing sexual harassment set forth in the policy. This argument is without merit.
The policy in effect during the 2003-2004 academic year specifically excluded from the definition of sexual harassment “consenting or welcome sexual relationships.” More to the point, J.B. testified that, although she and McCord were often together going to and from classes and basketball games, she did not consider the relationship to he sexual. On the con-ti’ary, she regarded McCord as a friend and “father figure.” Thus, even if Pitts had initiated an investigation, it would, presumably, have foundered for lack of a complainant.
For these reasons, we hold that Pitts was not deliberately indifferent to J.B.’s constitutional rights for purposes of imposition of liability, under either Title IX or *175 § 1983. Because the Title IX claim against Lawson State is premised on Pitts’s alleged inaction, the trial court correctly entered a summary judgment in favor of both Pitts and Lawson State.

B. Wiley’s Conduct

As for Wiley, J.B. concedes that Wiley’s conduct was less “egregious” than was Pitts’s. J.B.’s brief, at 62. No one alleges that Wiley knew of an inappropriate touching of S.P. by McCord. Wiley did know that J.B. and McCord spent time together. By deposition, Wiley testified that he expressed his concerns about the J.B./ McCord relationship to both J.B. and McCord. Specifically, Wiley testified:
“Q. [J.B.’s counsel:] Did you ever tell [McCord] you thought it was a bad idea for him to be taking [J.B.] home and picking her up?
“A. [Wiley:] Yes, I did. I told both. But they told me — she said he was a father figure to her.”
(Emphasis added.)
In any case, as we have already discussed in the context of the claims against Pitts, nothing in Wiley’s handling of the J.B./McCord relationship provides a basis for liability under § 1983. Therefore, the trial court correctly entered a summary judgment for Wiley.

C. Dr. Ward’s Conduct

The § 1983 claim is asserted against Dr. Ward solely on the ground that he “condoned” Pitts’s response to the 2002 incident and Pitts’s and Wiley’s handling of the ongoing J.B./McCord relationship. He did so, according to J.B., by testifying in deposition that he regarded their responses to each situation as appropriate under the circumstances. Because, as we have already discussed in this opinion, neither Pitts’s response to the 2002 incident nor the response of either Pitts or Wiley to the J.B./McCord relationship provides a basis for liability under § 1983, Dr. Ward’s alleged ratification of such responses does not afford a basis for liability. Thus, the trial court properly entered a summary judgment for Dr. Ward.

IV. Conclusion

For the foregoing reasons, the trial court correctly entered a summary judgment in favor of Lawson State, Pitts, Wiley, and Dr. Ward. That judgment is, therefore, affirmed.
AFFIRMED.
COBB, C.J., and SMITH, PARKER, and SHAW, JJ., concur.

. We are using initials to preserve the anonymity of the victims, as required by Rule 52, Ala. R.App. P.

. In 1987, McCord was convicted in Georgia of manslaughter.

. There is no issue as to the identity of the “clearly established ... constitutional right” involved in this case. “[T]he Due Process Clause of the Fourteenth Amendment [clearly] protects the right of a child to be free from sexual abuse inflicted by a public school teacher." Roseville, 296 F.3d at 438.